No. 16-1039

_____

# UNITED STATES COURT OF APPEALS
## for the
## FEDERAL CIRCUIT

_____

TRW AUTOMOTIVE U.S., LLC

*Plaintiff-Appellant*,

*v.*

MAGNA ELECTRONICS, INC.

*Defendant-Appellee.*

_____

Appeal from the Patent and Trademark Office – Patent Trial and Appeal Board in Inter Partes Review No. IPR2014-00262

_____

## BRIEF FOR APPELLANT TRW AUTOMOTIVE U.S., LLC

Jon R. Trembath
James E. Dallner
Alexander C. Clayden
LATHROP & GAGE LLP
950 17th Street, Suite 2400
Denver, Colorado 80202
Telephone:   (720) 931-3200
Fax:            (720) 931-3201
Email:         jtrembath@lathropgage.com
                 jdallner@lathropgage.com
                 aclayden@lathropgage.com

Douglas Link
LATHROP & GAGE LLP
4845 Pearl East Circle, Suite 201
Boulder, Colorado  80301
Telephone:   (720) 931-3000
Fax:            (720) 931-3001
Email:         dlink@lathropgage.com

*Attorneys for Plaintiff-Appellant TRW Automotive U.S., LLC*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant TRW Automotive U.S., LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

TRW Automotive U.S., LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

TRW Automotive U.S., LLC is a wholly-owned, indirect subsidiary of TRW Automotive Holdings Corp.  TRW Automotive Holdings Corp. is a publicly traded corporation.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Lathrop & Gage LLP
Jon R. Trembath
Allan J. Sternstein
Timothy K. Sendek
James E. Dallner
Alexander C. Clayden
A. Justin Poplin
Hissan Anis
Josh C. Snider

December 21, 2015                    */s/ Jon R. Trembath*
                                      Jon R. Trembath

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................. 1

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES ................................................................. 2

STATEMENT OF THE CASE ................................................................. 3

    I.     Proceedings Below ................................................................. 4

    II.    The '894 Patent and Prior Art ................................................................. 7

        A.    The '894 Patent ................................................................. 7

        B.    Yanagawa ................................................................. 10

SUMMARY OF THE ARGUMENT ................................................................. 11

ARGUMENT ................................................................. 13

    I.     Standard of Review ................................................................. 13

    II.    The Board Erred in Narrowly Construing Claim 1 of the '894 to Read Out a Disclosed Embodiment ................................................................. 14

    III.   The Board's Erroneous Construction of Claim 1 Violates Claim Differentiation. ................................................................. 20

    IV.   The Board Erred by Sua Sponte Narrowing Claim 25 of the '894 Patent to Distinguish Yanagawa. ................................................................. 21

CONCLUSION ................................................................. 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
  616 F.3d 1283 (Fed. Cir. 2010) ........................................................14

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ........................................................20

*In re Cuozzo Speed Techs., LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) ........................................... 11, 13, 16

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
  766 F.3d 1338 (Fed. Cir. 2014) ........................................................14

*Magna Electronics, Inc. v. TRW Automotive Holdings Corp. et al.*,
  Case No. 1:12-cv-00654 (W.D. Mich.) ...............................................1

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) ........................................................16

*Philips v. AWH Corp.*,
  415 F.3d 1303 ...........................................................................14, 20

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) ........................................................20

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*,
  --- F.3d ----, 2015 WL 7567492 (Fed. Cir. Nov. 25, 2015)............. 13, 16, 17, 18

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*,
  --- U.S. ---, 134 S.Ct. 2111 (2015) ...................................................13

*Thorner v. Sony Computer Entm't Am. L.L.C.*,
  669 F.3d 1362 (Fed. Cir. 2012) ........................................................18

**Statutes**

35 U.S.C. § 103(a) ..............................................................................4, 6

35 U.S.C. § 141(c) ....................................................................................................2

**Other Authorities**

37 C.F.R. § 42.100(b) ...........................................................................................16

Rule 47.5(a) ............................................................................................................1

## STATEMENT OF RELATED CASES

This is an appeal from a final written decision of the Patent Trial and Appeal Board ("Board") concerning certain claims of U.S. Patent No. 7,655,894 ("the '894 patent") in *inter partes* review case IPR2014-00262. The '894 patent is also the subject of the district court litigation captioned *Magna Electronics, Inc. v. TRW Automotive Holdings Corp. et al.*, Case No. 1:12-cv-00654 (W.D. Mich.).

Pursuant to Federal Circuit Rule 47.5(a), TRW states that no appeal from this same *inter partes* review proceeding was previously before this or any other appellate court, and there are no cases known to be pending in this Court that will directly affect or be directly affected by this Court's decision in the pending appeal. The district court in the above cited Case No. 1:12-cv-00654 construed a limitation of claim 1 of the '894 patent at issue in this appeal, and this Court's decision could affect the district court's claim construction in that case.

## **JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 35 U.S.C. § 141(c). This is an appeal of a final written decision of the Patent Trial and Appeal Board dated October 7, 2015, determining that TRW did not show by a preponderance of the evidence that the challenged claims are unpatentable in case IPR2014-00262.

## STATEMENT OF THE ISSUES

1.     Whether the Board erred in construing the "enhanced limitation" of claim 1 of the '894 patent inconsistently with the specification, thereby excluding a preferred embodiment from the claim's scope and giving claim 1 the same scope as a dependent claim?

2.     Whether the Board erred by *sua sponte* narrowing the scope of claim 25 of the '894 patent to distinguish TRW's asserted prior art, without any record evidence supporting a deviation from the broadest reasonable interpretation?

3

## STATEMENT OF THE CASE

### I.     Proceedings Below

The '894 describes image sensing technology for use in automobiles in which the image sensor captures images of the view in front of the vehicle, and processes the image data to perform control functions such as dimming or triggering the vehicle's high beam headlights.    A0475.    TRW identified several prior art references to the '894 patent disclosing the same purported invention which were not before the Patent Office during examination of the application that issued as the '894. A0063-65.

TRW sought *inter partes* review of certain claims of the '894 patent on December 17, 2013.  A0044, A0110.  On June 26, 2014, the Board instituted trial as to claims 1-3, 5, 10, 13-16, 25, 26 and 28.    A0260.    Each of the grounds of unpatentability instituted by the Board was premised on obviousness under 35 U.S.C. § 103(a), and based upon a combination of prior art in which Japanese Kokai Application by Yanagawa et al., No S62-131837 ("Yanagawa") comprises the primary reference.  *Id.*  The Board's institution decision found that TRW had demonstrated a reasonable likelihood that Yanagawa, combined with other references, rendered each of claims 1-3, 5, 10, 13-16, 25, 26 and 28 obvious.

Following institution of trial, on September 30, 2014, Appellee Magna Electronics Inc. ("Magna") filed its Patent Owner Response.   A0309, A0340. Magna argued the following limitation of claim 1 should be construed:

> wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor.

A0319; *see also* A0495.  Magna proposed that the Board narrow this "*enhanced limitation*" to mean "the quality of the identification of objects is improved."  *Id.* Magna's claim construction argument invoked a portion of a dictionary definition of the word "enhance" and cited a section of the '894 patent specification that Magna characterized as describing use of "a plurality of frames [to] guard[] against erroneous object detection due to noise and [to] eliminate[] headlamp toggling when sources are at the fringe of the detection."  A0319-20.  Magna also argued that Yanagawa did not disclose the final limitation of claim 25 of the '894 patent. A0333-35.

In its Rebuttal brief, TRW highlighted several reasons why Magna's narrowing construction of the *enhanced* limitation of claim 1 did not represent the broadest reasonable interpretation in view of the '894 patent specification.  A0353-55.   TRW proposed a construction of the enhanced limitation as including "identifying a further characteristic of an identified object."  A0354.  As TRW noted, such a construction follows from the dictionary definition submitted by

Magna, which defines "enhance" as meaning "to *increase* or improve in value, quality, desirability, or attractiveness." *Id.* TRW demonstrated in its Rebuttal (as set forth initially in its Petition) that Yanagawa discloses the *enhanced* limitation by virtue of its discussion of using successive frames of image data to obtain information on object motion and deduce information as to object speed and distance. A0355-357. Further, TRW countered Magna's argument on claim 25 by demonstrating that Yanagawa does in fact disclose processing successive frames of image data in order to identify, at least in part, objects of interest. A0357.

The Board issued its Final Written Decision on June 25, 2015, concluding that TRW had not shown the instituted claims of the '894 patent to be unpatentable under 35 U.S.C. § 103(a). A0001-15. As to claim 1 and its dependent claims, the Board's Decision turns solely on its construction of the *enhanced* limitation. *See id.* Although recognizing its obligation to give each claim of the '894 its broadest reasonable construction in light of the specification, the Board narrowed claim 1 and its dependent claims to require enhancement by virtue of error reduction. A0005-09. The Board alternately phrased its narrowing construction of the *enhanced* limitation as requiring: (a) "the quality of the identification of objects of interest is better than it would have been if the identification had not been based on processing multiple frames of image data"; or (b) "an identification based on processing multiple frames of image data is less likely to be erroneous than an

identification based on the processing of a single frame of image data." A0007, A0009. To support this construction, the Board selected one aspect of the dictionary definition submitted by Magna, and cited to certain portions of the '894 patent specification. A0006-09. The Board did not consider or rely upon expert testimony, or resolve any factual disputes in connection with its construction of the *enhanced* limitation. *Id.*

As to claim 25 and its dependent claims, the Board narrowly read the final claim limitation to distinguish Yanagawa. A00014-15. The Board's approach necessarily relies upon a *sua sponte* construction of that claim limitation, in which the Board narrowed the plain language of the claim and again departed from the broadest reasonable interpretation. *See* A0015. The Board did not cite any evidence for its narrowing construction of claim 25, let alone any extrinsic evidence. *Id.*

## II.    The '894 Patent and Prior Art

### A.    The '894 Patent

The '894 patent generally describes a vehicle image sensing system capable of detecting objects, such as headlights and taillights of other vehicles, and controlling on-board vehicle systems, such as high-beam or low-beam headlights, in response to such object detection. *See*, *e.g.*, A0475 at Abstract, A0491 at 3:34-41. "Qualifying or disqualifying objects" is used in the '894 patent to designate an

7

identified object (typically, a headlight or taillight) as warranting an action. *See* A0494 at 10:32-41. Designating an object as being qualified results in a signal being generated, such as one controlling the headlights. *See* A0491-93 at 3:33-7:45.

> The '894 patent Abstract describes the purported invention as follows:
>
> The image sensing system may identify objects of interest based on spectral differentiation or by comparing over successive frames image data associated with objects in the forward field of view of the image sensor or by objects of interest being at least one of qualified and disqualified based at least in part on object motion in the field of view of the imaging sensor.

A0475 at Abstract; *see also* A0491 at 3:33-41. The primary mode for detection of headlights or taillights described in the '894 patent involves spectral differentiation, *i.e.*, distinguishing red, blue and green pixels of light sources outside the vehicle captured by the image sensor. *See* A0491-92 at 4:55-5:5; A0492-93 at 6:32-7:3. Such spectral differentiation is performed based on analysis of a single frame of image data. *See* AA0492-93 at 6:33-7:3.

The '894 patent discusses additional embodiments of the purported invention in which the imaging system analyzes other aspects of detected objects. A0494 at 10:19-45. The specification presents these various embodiments as ways in which identification, detection or recognition of objects may be enhanced or assisted. *Id.* Two embodiments are discussed in which objects may be identified through analyzing a single frame of image data. First, spatial filtering may be used "to

further enhance the ability to identify light sources" by "evaluation of adjacent pixel groups[.]"   A0494 at 10:20-30.   In a second embodiment, "[p]attern recognition may be used to further assist in the detection of headlights, taillights, and other objects of interest."   *Id.* at 10:33-35.   "For example, the fact that headlights and taillights usually occur in pairs could be used to assist in qualifying or disqualifying objects as headlights and taillights."   *Id.* at 10:37-39.

The '894 patent also describes an embodiment in which the imaging system gains information about objects through comparison of successive frames of image data, *i.e.*, temporal processing.   *Id.* at 10:42-46.   The specification provides:

> Furthermore, object recognition can be **enhanced** by comparing identified objects over successive frames.   This temporal processing can yield information on object motion **and** can be used to assist in qualifying or disqualifying objects of interest.

*Id.* (emphasis added).   This is the *only* reference in the specification that ties object identification *enhancement* to object motion.

Other portions of the specification suggest comparison of successive frames of image data.   *See* A0495 at 11:23-12:9 ("sensing that the intensity of a leading taillight has abruptly increased" to identify "a condition where the leading vehicle is braking" or identifying "lane markers" to determine that "a lane change is occurring"); *see also* A0493 at 7:28-37 ("Control routine 100 provides hysteresis by requiring that a headlight spectral signature or taillight spectral signature be

detected for a number of frames prior to switching the headlights to a low-beam state. . . . This hysteresis guards against erroneous detection due to noise in a given frame and eliminates headlamp toggling when sources are at the fringe of detection range."). However, unlike the specification section discussed in the prior paragraph, these specification references ***do not*** expressly tie comparing successive frames of image data to *enhanced* object identification.

Claim 4 depends from claim 1 and adds the limitation that "objects of interest are at least one of qualified and disqualified based at least in part on object motion[.]" A0495 at 12:50-53. Claim 1 does not require the ultimate qualification or disqualification of an object. *Id.* at 12:17-39. This suggests identifying an object of interest is different from qualifying or disqualifying an object and that identification of the object is a precursor to qualification or disqualification.

### B. Yanagawa

Like the '894 patent, Yanagawa—which published more than 20 years before the actual filing date of the '894 patent and nearly 9 years before its claimed priority date—describes a system for use in a vehicle capable of recognizing the "presence of headlights of a vehicle traveling ahead and headlights of an oncoming vehicle . . . and . . . controlling the device vehicle's headlights automatically" in response to such detection. A0695. The vehicle recognition device disclosed by Yanagawa uses spectral differentiation to identify other vehicles' headlights and taillights.

10

A0696-97.   Frames of image data used by the Yanagawa device for identifying

headlights and taillights by spectral differentiation are stored every 0.05 second in a

memory.   A0697.   The device then compares successive frames of such stored

image data, enabling a calculation of "the distance [] from a vehicle traveling ahead

and the speed relative to the vehicle traveling ahead[.]"   A0698.   As a result of its

temporal processing of image data, Yanagawa's imaging system can identify an

object of interest—"a potential rear-end collision, and an audible or other type of

warning can be issued to a driver based on this prediction."   A0699; *see also*

A0696.

## SUMMARY OF THE ARGUMENT

Claim construction in *inter partes* review cases is based on the broadest

reasonable interpretation of claim language in view of the patent specification.   *In

re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279 (Fed. Cir. 2015).   The Board

deviated from that standard by narrowing the scope of the claim limitations at issue

to distinguish prior art.   In this appeal, TRW seeks correction of the Board's claim

construction errors and a remand of the proceeding so that the Board may properly

consider the undisputed prior art in view of the proper scope of claims 1 and 25 of

the '894 patent and challenged claims that depend therefrom.

The Board's claim construction approach with respect to the *enhanced*

limitation violates not only the broadest reasonable interpretation standard, but also

fundamental tenets of claim construction. Namely, by narrowing the *enhanced* limitation to require "enhanced" to mean reducing error in identification of objects of interest, the Board departed from the plain and ordinary meaning of the claim language, read out a preferred embodiment disclosed in the '894 patent specification, and violated the doctrine of claim differentiation.

Under the plain and ordinary meaning, to "enhance" certainly embraces "improving" but it also includes the notion of increasing the information available about an object. The Board, however, ignored the fact that increasing information about objects of interest would meet the plain language of the *enhanced* limitation, and confined the claim language "to mean that the quality of the identification of objects of interest is improved; i.e., that the identification is less likely to be erroneous." A0012. The Board's narrow construction reads out an embodiment described in the '894 patent in which obtaining information on object motion is sufficient to enhance identification of objects of interest. The error of the Board's construction of the *enhanced* limitation is further confirmed by consideration of dependent claim 4, which incorporates the limitations that the Board improperly read into claim 1. The Board's construction of claim 1 did not rest upon any unique definition by the applicant of the term "enhanced" or a disclaimer of claim scope. Rather, it merely adopted Magna's misguided arguments based on an isolated excerpt of the specification and a dictionary definition.

The Board further erred in its inherent construction of the disputed limitation of claim 25.  Although neither party to the case argued for a narrowed scope of the claim phrase "to identify, at least in part, an object of interest," the Board necessarily construed that phrase in order to distinguish the disclosure from Yanagawa corresponding to the limitation at issue.  *See* A0015.  The Board's *sua sponte* construction of claim 25 narrowed the plain and ordinary meaning of the claim language, but again was unsupported by any definition or disclaimer in the patent specification or file history.

## ARGUMENT

### I.     Standard of Review

This Court reviews the Board's claim construction in accordance with the Supreme Court's decision in *Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, --- U.S. ---, 134 S.Ct. 2111 (2015).  *In re Cuozzo Speed Techs.*, 793 F.3d at 1279. Factual determinations by the Board concerning extrinsic evidence are reviewed under the substantial evidence standard, while the ultimate claim construction is reviewed de novo.  *Id.* at 1280.  Where the Board's construction is premised on intrinsic evidence, such as in this case, this Court's review is de novo.  *Id.*; *Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, --- F.3d ----, 2015 WL 7567492, *3 (Fed. Cir. Nov. 25, 2015).

## II.    The Board Erred in Narrowly Construing Claim 1 of the '894 to Read Out a Disclosed Embodiment

A claim construction that reads out a preferred embodiment is incorrect absent compelling evidentiary support. *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014); *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support."). In this case, Magna did not present any evidence that would compel narrowing claim 1 to exclude preferred embodiments. No prosecution history disclaimer was argued, nor was any special definition used in the '894 patent specification to limit the meaning of the word "enhanced." *See Philips v. AWH Corp.*, 415 F.3d 1303, 1317-18; A0005-09. Yet, the Board narrowed claim 1 and its dependent claims to read out the only embodiment describing what is claimed, leading it to erroneously conclude that prior art which teaches what the '894 patent describes did not disclose the "enhanced" limitation.

The '894 patent discloses an embodiment in which obtaining information on object motion enhances a previous object identification or recognition. The specification provides that "object recognition can be enhanced by comparing identified objects over successive frames. This temporal processing can yield information on object motion **and** can be used to assist in qualifying or

14

disqualifying objects of interest." A0494 at 10:43-46 (emphasis added). In other words, temporal processing may enhance object identification by adding information about object motion, without more. This is the **only** reference in the specification tying enhanced object identification with comparing successive frames of image data.

The *enhanced* limitation of claim 1 is directed to such temporal processing of image data. The limitation requires that "identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor." A0495 at 12:36-39. According to the plain language of claim 1, objects of interest may be identified by processing a single frame of image data derived from the imaging sensor. *See id.* at 12: 30-35. Indeed, the limitations preceding the *enhanced* limitation require first that an image processor is provided for processing image data from the image sensor, and second that objects of interest are identified "by processing said image data to identify objects of interest based at least on spectral differentiation[.]" *Id.* Once objects of interest have been identified through processing of image data, the identification is then "enhanced" by comparing successive frames of image data. *Id.* at 12:36-39. Under a plain reading of the claim language, enhancement of object identification derived from a comparison of successive frames of image data need not result in qualifying or disqualifying "objects of interest." *Id.*

15

The Board's construction reads out the embodiment described in the specification in which object identification is enhanced by temporal processing which yields information on object motion.  The Board limited the meaning of how temporal processing may enhance identification of objects of interest to require that comparison of successive frames of image data reduces error in identification. A0007, A0009.  However, obtaining new information about object motion—an exemplar enhancement of object recognition described in the specification—does not necessarily affect the error rate in identifying objects of interest.  *See* A0494 at 10:43-46.  By altering the plain and ordinary meaning of the *enhanced* limitation and eliminating an embodiment described in the '894 patent specification from the scope of claim 1 (and challenged dependent claims), the Board departed from the broadest reasonable interpretation standard of claim construction.  *See* 37 C.F.R. § 42.100(b); *In re Cuozzo*, 793 F.3d  at 1279; *see also Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.").

The Board's deviation from established principles of claim construction must be warranted by clear instruction in the intrinsic record of the patent.  For example, a construction that excludes a preferred embodiment may be justified if the embodiment was clearly disclaimed or defined in the specification or during prosecution.  *Oatey Co.*, 514 F.3d at 1276; *see also Straight Path IP Grp., Inc. v.*

16

*Sipnet EU S.R.O.*, 2015 WL 7567492, at *5 (reversing Board's claim construction which departed from the plain and ordinary meaning based on one passage from the specification). Here, no such disclaimer or definition exists.

Instead, the Board based its construction on a portion of the specification that discusses the control routine which controls the vehicles headlights—switching the headlights to low-beam in response to detection of oncoming headlights or leading taillights, and back to hi-beam in the absence of such detection. *See* A0008-09 (citing '894 patent at 7:28-31 & 7:33-36). This portion of the specification discusses how requiring that oncoming headlights or leading taillights be detected for multiple frames before switching the vehicles headlamps is desirable. A0493 at 7:28-45. Nothing in that description, however, disclaims an interpretation of "enhanced" identification of objects of interest that includes gaining information on object motion. *See id.* Moreover, the referenced portion of the specification does not call the hysteresis process described an "enhancement" to object identification.

The Board also cited an inapposite description of other embodiments described in the '894 to support its narrow construction of the *enhanced* limitation. A0007-08. The specification's descriptions of a "spatial filtering" embodiment and a "pattern recognition" embodiment are unrelated to the temporal processing claimed in the *enhanced* limitation. *See* A0494 at 10:18-45. Spatial filtering and pattern recognition are ways in which object detection may be performed by

17

assessing a single frame of image data. *See id.* Separately, the '894 patent indicates that temporal processing (*i.e.*, "comparing identified objects over successive frames") is a way to enhance "object recognition"—including by obtaining information on object motion. *Id.* at 10:41-45. The '894 patent's descriptions of spatial filtering and pattern recognition embodiments simply do not speak to the meaning of how "identification of objects of interest is enhanced by comparing over successive frames image data" as claimed in claim 1. Description of these other embodiments cannot properly limit the scope of the *enhanced* limitation which focuses on temporal processing. *E.g.*, *Thorner v. Sony Computer Entm't Am. L.L.C.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (holding that it is not enough that the only embodiment, or all of the embodiments, contain a particular limitation to limit a claim to that particular limitation).

Likewise, the Board's narrow construction cannot properly be premised on the dictionary definition proffered by Magna. The Webster's definition for "enhanced" offered by Magna was not limited to a meaning requiring improvement in quality by reducing the possibility for error. Rather, under that definition, "enhanced" means to "heighten" or "increase," including especially "to increase or improve in value, quality, desirability, or attractiveness." A1441. Obtaining information on object motion is certainly increasing information known about an object. Thus, even under Magna's dictionary definition, the disclosed embodiment

of enhancing identification of objects of interest by using temporal processing to gain information on object motion is within the proper scope of claim 1.

The Board improperly narrowed claim 1 by construing the *enhanced* limitation to exclude a preferred embodiment disclosed in the '894 patent. That error infected the Board's analysis of whether Yanagawa discloses the *enhanced* limitation. A0010-13. Further, that flawed analysis was the lynchpin for the Board's assessment of the merits of TRW's challenges to claims 2, 3, 5, 10 and 13-16, each of which depend from claim 1. A0013-14. Because it failed to adopt the broadest reasonable interpretation of claims 1, 2, 3, 5, 10 and 13-16 of the '894 patent, the Board erred in its claim construction and its Decision as to such claims must be reversed.

Yanagawa discloses using image data, including spacing between taillights, from multiple frames to calculate the speed of the vehicle "relative to a vehicle traveling ahead." A0698. This temporal calculation enhances the information available about the object of interest—it informs how far the taillights are from the vehicle and the rate at which the vehicle is closing on the taillights. Claim 1 requires nothing more. Thus, under a proper construction, Yanagawa satisfies the limitation at issue.

### III.    The Board's Erroneous Construction of Claim 1 Violates Claim Differentiation.

The error in the Board's narrow construction of the *enhanced* limitation is further evident upon consideration of the other claims of the '894 patent. Generally, "[t]here is a rebuttable presumption that different claims are of different scope." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003). In view of the fundamental premise that claims of a patent should be construed separately, the *Phillips* court explained that "claim terms should not be read to contain a limitation where another claim restricts the invention in exactly the same manner." *Phillips v. AWH Corp.*, 415 F.3d at 1324-25 (internal quotation and alteration marks omitted). Indeed, "[i]t is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985).

The Board's narrow construction of the *enhanced* limitation of claim 1 cannot be squared with dependent claim 4. The Board construed the *enhanced* limitation to require that identification was improved in quality by comparing successive frames of image data so as to reduce error in qualifying or disqualifying objects as "objects of interest." A0007, A0009. However, dependent claim 4 adds essentially the same limitation that the Board improperly read into claim 1:

The image sensing system of claim 1, wherein objects of interest are at least one of qualified and disqualified based at least in part on object motion in said field of view of said imaging sensor.

A0495 at 12:50-53.   Because claim 4 adds the limitation of qualifying or disqualifying objects of interest based on detection of object motion (which must be gleaned from temporal processing as described in the '894 patent), claim 1 should not be read to include this limitation.   However, the Board's construction does just that—the Board narrowed the meaning of "enhanced" to require not just obtaining information about object motion, but to also require that such information be used to correctly identify objects of interest.   A0007, A0009.   The Board thus erased the distinction between claim 1 and its dependent claim 4, in violation of the doctrine of claim differentiation and this Court's settled law.

The broadest reasonable interpretation of the *enhanced* limitation of claim 1 of the '894 patent is certainly broader than dependent claim 4.   Because the Board improperly imported limitations from other claims into independent claim 1, its construction must be corrected, and its Decision reversed.

## IV.    The Board Erred by *Sua Sponte* Narrowing Claim 25 of the '894 Patent to Distinguish Yanagawa.

As with Claim 1 and its challenged dependent claims, the Board's Decision as to Claim 25, 26 and 28 turned on a single issue of claim construction.   The Board inherently construed the phrase "to identify, at least in part, an object of interest" in

a narrow, restrictive manner that departs from its broadest reasonable interpretation. This claim phrase was not raised for construction by the Board or by either party, but the Board nonetheless narrowed the scope of the phrase to distinguish Yanagawa.

The disputed limitation central to the Board's analysis of TRW's challenges to claims 25, 26 and 28 provides:

> Wherein a comparison is made by said logic and control circuit of a frame comprising image data to a successor frame in order to identify, at least in part, an object of interest.

A0497 at 15:34-37.   Claim 27 depends from claim 25 and adds that "objects of interest are at least one of qualified and disqualified at least in part on object motion."  *Id.* at 16:1-4.

The '894 patent was drafted to be broad.   An "object of interest" is not defined.   Indeed, the specification suggests an object of interest may be headlights and taillights, a stop sign, a caution sign, a traffic light or a **braking vehicle**. A0494 at 9:4-10; A0495 at 11:23-36.   Lane markers also appear to be objects of interest, as does moisture.   A0495 at 12:3-9.   Nowhere does the specification explain how one could **identify** an object of interest by comparing successive images[1] nor does the specification describe how "object motion" can be used to

---

[1] At best, the specification teaches using successive frames to identify **noise**, not an object of interest.  *See* A0493 at 7:28-35.

"qualify" or "disqualify" an object. Given the unlimited scope of the terms used to claim the purported '894 invention, Yanagawa falls within the intended breadth of the disputed '894 claim term.

Yanagawa's system performs a comparison of successive frames of image data to calculate the distance between vehicles and relative speed, thus identifying a leading vehicle as a potential rear-end collision object. A0356-57. Similarly, the '894 patent teaches that changes in the spatial relationship between the device vehicle and a detected object are of interest, and that such conditions may be identified by the claimed invention. While not explaining how such would occur and without limiting any of the terms at issue, the specification states: "by sensing that the intensity of a leading taillight has abruptly increased, *a condition where the leading vehicle is braking may be identified* and suitable action taken." A0495 at 11:28-31 (emphasis added). In a similar vein, the specification informs that the "present invention can be used to detect lane markers in order to either assist in steering the vehicle or *provide a warning to the driver that a lane change is occurring*." *Id.* at 12:3-5. While not described, to identify changing conditions— such as determining that the intensity of a leading taillight has abruptly increased or determining that a lane change is occurring—the invention claimed in the '894 patent necessarily must compare successive frames of image data. *See* A0494 at 10:42-46. Indeed, the image sensing system described in the '894 patent captures

single frames of image data, and only by employing "temporal processing" or a comparison of those frames may the system derive "information on object motion[.]" *Id.* at 10:44-45.

Thus, the broadest reasonable interpretation of disputed limitation of claim 25 consistent with the specification is not limited to only an initial identification of leading taillights (or oncoming headlights). Rather, use of temporal processing to "identify, at least in part, an object of interest" encompasses identification of objects that present a changed condition of interest—such as an abrupt increase in taillight intensity. Such necessarily requires identification of the taillight before its intensity increases. The broadest reasonable interpretation of claim 25 in view of the specification therefore must include this type of a new identification of an object of interest, even if the object was previously identified by the system.

The Board's construction of the disputed limitation of claim 25 erroneously excludes claim scope covering a second identification of a previously identified object. Applying this flawed construction, the Board improperly distinguished Yanagawa, which discloses the final limitation of claim 25 by teaching the use of temporal processing to identify a potential rear-end collision object. As detailed above, the specification is at odds with the Board's narrow construction. This erroneous *sua sponte* construction of claim 25 was the sole basis for the Board's assessment of the merits of TRW's challenges to claims 25, 26 and 28. A0015.

Because it failed to adopt the broadest reasonable interpretation of claims 25, 26 and 28 of the '894 patent, the Board erred in its claim construction and its Decision as to such claims must be reversed.

## CONCLUSION

This Court should reverse the Board's Final Decision and remand this case for further proceedings.

Dated: December 21, 2015.

Respectfully submitted,

*/s/ Jon R. Trembath*

Jon R. Trembath
James E. Dallner
Alexander C. Clayden
LATHROP & GAGE LLP
950 17th Street, Suite 2400
Denver, Colorado 80202
Telephone:   (720) 931-3200
Fax:             (720) 931-3201
Email:          jtrembath@lathropgage.com
                    jdallner@lathropgage.com
                    aclayden@lathropgage.com

Douglas Link
LATHROP & GAGE LLP
4845 Pearl East Circle, Suite 201
Boulder, Colorado  80301
Telephone:   (720) 931-3000
Fax:             (720) 931-3001
Email:          dlink@lathropgage.com

# ADDENDUM

Trials@uspto.gov                                                    Paper 37
Tel: 571-272-7822                                      Entered:  June 25, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

TRW AUTOMOTIVE US LLC,
Petitioner,

v.

MAGNA ELECTRONICS INC.,
Patent Owner.

———————————

Case IPR2014-00262
Patent 7,655,894 B2

———————————

Before JUSTIN T. ARBES, BENJAMIN D. M. WOOD, and
NEIL T. POWELL, *Administrative Patent Judges.*

WOOD, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00262
Patent 7,655,894 B2

# I.    INTRODUCTION

## A.    Background

TRW Automotive US LLC ("TRW") filed a Petition (Paper 1, "Pet.")
to institute an *inter partes* review of claims 1–5, 9, 10, 12–21, and 24–28 of
U.S. Patent No. 7,655,894 B2 (Ex. 1002, "the '894 patent").  Magna
Electronics Inc. ("Magna") filed a Preliminary Response.  Paper 7.  We
instituted an *inter partes* review of claims 1–3, 5, 10, 13–16, 25, 26, and 28
based on the following proposed grounds of unpatentability:

| Reference[s] | Basis | Claims Challenged |
|---|---|---|
| Yanagawa,[1] Vellacott,[2] and Koshizawa[3] | § 103(a) | 1–3, 5, and 10 |
| Yanagawa, Vellacott, Koshizawa, and Bottesch[4] | § 103(a) | 16 |
| Yanagawa, Vellacott, Koshizawa, and Aurora[5] | § 103(a) | 13 and 14 |
| Yanagawa, Vellacott, Koshizawa, and Kawahara[6] | § 103(a) | 15, 25, 26, and 28 |

After the Board instituted trial, Magna filed a Patent Owner Response
(Paper 23, "PO Resp."), to which TRW replied (Paper 27, "Pet. Reply").

---

[1] JP S62-131837 to Yanagawa (June 15, 1987) (Ex. 1005).

[2] Oliver Vellacott, *CMOS in Camera*, IEE REVIEW (May 1994) (Ex. 1007).

[3] US 5,177,606 to Koshizawa (Jan. 5, 1993) (Ex. 1008).

[4] US 5,166,681 to Bottesch et al. (Nov. 24, 1992) (Ex. 1010).

[5] Mai Chen, *AURORA: A Vision-Based Roadway Departure Warning System*, 1995 IEEE/RSJ INT'L CONG. ON INTELLIGENT ROBOTS AND SYS. (Aug. 9, 1995) (Ex. 1012).

[6] US 4,758,883 to Kawahara (Jul. 19, 1988) (Ex. 1013).

A0002

IPR2014-00262
Patent 7,655,894 B2

Oral Hearing was held on February 19, 2015, and the Hearing Transcript (Paper 36, "Tr.") has been entered in the record.

We have jurisdiction under 35 U.S.C. § 6(c). This Final Decision is entered pursuant to 35 U.S.C. § 318(a). We determine that TRW has not shown by a preponderance of the evidence that the challenged claims are unpatentable.

### B.    Related Proceedings

TRW discloses that the '894 patent has been asserted in *Magna Electronics, Inc. v. TRW Automotive Holdings Corp*., Case No. 1:12-cv-00654-PLM (W.D. Mich. 2012). Pet. 6.

### C.    The '894 Patent (Ex. 1002)

The '894 patent, titled "Vehicular Image Sensing System," describes a system for controlling a vehicle—e.g., dimming the vehicle's headlights—in response to detecting "objects of interest" in front of the vehicle—e.g., the headlights of oncoming vehicles and the taillights of leading vehicles. Ex. 1002, 1:19–24. The system uses an image sensor that divides the scene in front of the vehicle into "a plurality of spatially separated sensing regions." *Id*. at 2:9–12. A control circuit with a processor receives image data from the image sensor and determines if individual regions include light sources having a particular characteristic, such as a "spectral characteristic" (color), or intensity. *Id*. at 1:60–66, 5:48–56. By comparing the lights' characteristics with the "distribution" of the lights across the spatially separated sensing regions, such as the lights' proximity to each other and to the vehicle's central axis, the system can distinguish oncoming headlights and leading taillights from streetlights and other lights that are not of interest to the system. *Id*. at 2:38–49.

3

### D.    Illustrative Claims

Of the claims at issue in this proceeding, claims 1 and 25 are independent, and each is drawn to an image sensing system for a vehicle. Ex. 1002, 12:18–15:37.  Claims 2, 3, 5, 10, and 13–16 depend directly or indirectly from claim 1, and claims 26 and 28 depend directly or indirectly from claim 25.  *Id*. at 12:18–16:9.

The independent claims share at least three common limitations: (1) an imaging sensor comprising a two-dimensional array of light-sensing photosensor elements; (2) the imaging sensor being inside the vehicle on which it is mounted, having a forward field of view through the vehicle's windshield; and (3) a logic and control circuit comprising a processor that processes the image data to identify objects of interest.  Ex. 1002, 12:18–32, 13:55–67, 14: 31–42, 15:11–24.  Independent claim 1 is illustrative and is reproduced below:

> 1. An image sensing system for a vehicle, said image sensing system comprising:
>
> an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate;
>
> wherein said imaging sensor is disposed at an interior portion of the vehicle proximate the windshield of the vehicle and wherein said interior portion is at or proximate to an interior rearview mirror assembly of the vehicle and wherein said imaging sensor has a forward field of view to the exterior of the vehicle through the windshield;
>
> a logic and control circuit comprising an image processor for processing image data derived from said imaging sensor;
>
> wherein said image sensing system identifies objects of interest by processing said image data to identify objects of interest based at least on spectral differentiation; and

wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor.

## II.    ANALYSIS

### A.    *Claim Construction*

"A claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Tech., LLC*, 778 F.3d 1271, 1281 (Fed. Cir. 2015) ("We conclude that Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA."). Under that standard, the claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Thus, we generally give claim terms their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).

We construe the following term in claim 1: "wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor" ("the *enhanced* limitation"). No other terms require express construction for purposes of this decision.

IPR2014-00262
Patent 7,655,894 B2

> *"wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor"*

The parties dispute the meaning of this term, and in particular the meaning of the phrase "the identification of objects of interest is enhanced." Magna argues that this phrase means "the quality of the identification of objects [of interest] is improved." PO Resp. 6. According to Magna,

> The ordinary and customary meaning of the term "enhanced" is "to increase or improve in value, quality, desirability, or attractiveness." (Merriam-Webster definition of "enhance," Ex. 2034). The phrase "is enhanced" directly follows "identification of objects of interest." Accordingly, the plain language of claim 1 is clear that the quality of the identification of objects is improved.

*Id*. Magna asserts that the '894 patent Specification "is consistent with this construction," as it explains that "using a plurality of frames [of image data] guards against erroneous object detection due to noise and eliminates headlamp toggling when sources are at the fringe of the detection range." *Id*. at 6–7 (quoting Ex. 1002, 7:28–37). Thus, Magna asserts that "the recited enhancement is part of the object-identification process, not separate from it." *Id*. at 7.

TRW's position, however, is that the construction of "identification of objects of interest is enhanced" in claim 1 "includes identifying a further characteristic of an object of interest." Pet. Reply 3. Like Magna, TRW finds support for its proposed interpretation in the dictionary definition of "enhanced" set forth in Ex. 2034. *Id*. at 2; *see* Tr. 8:23–9:14 (agreeing with Magna that "enhanced" means "to increase or improve value [or] the quality,

IPR2014-00262
Patent 7,655,894 B2

desirability or attractiveness"). And, again like Magna, TRW finds support
for its proposed construction in the Specification. TRW states:

> [T]he '894 Patent describes (i) obtaining information on object
> motion, (ii) by comparing objects over successive frames,
> (iii) to enhance object recognition. While the '894 Patent does
> use hysteresis, it is clear that the '894 Patent also initially
> *identifies* a headlight or taillight spectral signature in a *single
> frame*. *See* 1002 at 6:32–7:17. The hysteresis is used to
> determine when to send a signal to switch the headbeam state,
> not to identify an object. *See* 1002 at 7:28–35.

*Id*. at 2–3 (emphasis in original).

The claim language at issue recites that the "*identification* of objects
of interest is enhanced" (emphasis added). It does not, as TRW's arguments
suggest, recite that the knowledge of various aspects of the object of interest
is enhanced. Further, using the definition of "enhance" on which the parties
apparently agree (PO Resp. 6 (quoting Ex. 2034); Pet. Reply 2 (same)), the
plain meaning of "identification of objects of interest is enhanced" is that the
identification of objects of interest is improved, e.g., in quality, as Magna
proposes. That is, the quality of the identification of objects of interest is
better than it would have been if the identification had not been based on
processing multiple frames of image data.

The Specification supports this interpretation in two ways. First, the
Specification uses the term "enhance" in the context of describing
processing techniques that improve the quality of an identification of an
object of interest—i.e., that improve the likelihood of correctly identifying,
or "recognizing," objects of interest, and ignoring objects not of interest.
For example, the Specification teaches that

7

IPR2014-00262
Patent 7,655,894 B2

> The present invention is capable of utilizing spatial filtering to even further *enhance* the ability to identify light sources. . . . For example, it can be concluded that very closely adjacent red and white light sources are *not of interest* as oncoming headlights or taillights . . . [because they] can be identified as a streetlight.

Ex. 1002, 10:18–31 (emphasis added).  Likewise, the Specification teaches that

> Pattern recognition may be used to further assist in the detection of headlights, taillights, and other objects of interest. . . . By looking for a triad pattern, including the center high-mounted stoplight required on the rear of vehicles, stoplight *recognition* can be *enhanced*.  Furthermore, "object *recognition* can be *enhanced* by comparing identified objects over successive frames.  This temporal processing can yield information on object motion and can be used to assist in *qualifying or disqualifying objects of interest*.

*Id*. at 10:33–45.

Second, the Specification teaches that processing image data over several frames does, in fact, improve the quality of the identification of objects of interest.  In particular, the Specification teaches a control routine that "requir[es] that a headlight spectral signature or a taillight spectral signature [to] be detected for a number of frames prior to switching the headlights to a low-beam state."  *Id*. at 7:28–31.  Doing so "guards against erroneous detection due to noise in a given frame."  *Id*. at 7:33–36.  That is, this control routine improves the quality of the identification of objects of interest by reducing the chance that noise in a single frame will cause the system to erroneously detect an object of interest when none is present.

We do not find persuasive TRW's argument that Magna's interpretation "reads out embodiments where an object of interest is

IPR2014-00262
Patent 7,655,894 B2

recognized in a single frame." Pet. Reply 2. The interpretation does not require that the identification of objects of interest always requires processing of multiple frames of image data; rather, it means that an identification based on processing multiple frames of image data is less likely to be erroneous than an identification based on the processing of a single frame of image data. To summarize, we agree with Magna that the broadest reasonable interpretation of "identification of objects of interest is enhanced" is that the quality of the identification of objects of interest is improved. Further, the quality of such identification is improved when the possibility of error is reduced.[7]

> B.    *Claims 1–3, 5, and 10—Obviousness—Yanagawa, Vellacott, and Koshizawa*

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). In the Decision to Institute, we adopted Petitioner's proposed definition of a person having ordinary skill in the art of the '894 patent at the time of the invention, which was supported by Dr. Miller's testimony.

---

[7] We note that our construction is consistent with the court's construction of the same term in *Magna Elec., Inc. v. TRW Automotive Holdings Corp.*, Civ. No. 1:12-cv-654, slip op. at 22 (W.D. Mich. Apr. 28, 2015p ). There, the court adopted Magna's construction of the term, i.e., that "identification of objects if interest is improved." *Id.* The court explained that "the specification and claims describe a system that operates better after comparing successive frames than it would if it captured only one frame." *Id.* at 23.

IPR2014-00262
Patent 7,655,894 B2

Dec. 12–13.  The parties have not disputed this definition, and we see no reason to modify it in light of the record developed during trial.  Therefore, we conclude that a person of ordinary skill in the art would have had at least the qualifications of or equivalent to either (1) a master's degree in electrical engineering or computer science, with course work or research in vision systems, or (2) an undergraduate degree in electrical engineering or computer science with at least two years of work making optical vision systems.  Id. (citing Pet. 22, Ex. 1014 ¶ 19).

### 1.    Claim 1

TRW relies on Yanagawa as teaching most of the limitations of independent claim 1.  Pet. 21–22.  Yanagawa describes a vehicle-mounted imaging apparatus that detects the high beams of oncoming vehicles and taillights of leading vehicles based on the "color features" of the lights and whether the lights are at the same height.  Ex. 1005, 002–003.  Yanagawa's system dims the vehicle's headlights in response to such detection.  *Id*. at 001.

TRW relies on the following excerpt from Yanagawa to teach the *enhanced* limitation:

> The distance between vehicles is calculated in this way every 0.05 second as the image data are stored, and the speed of the device vehicle relative to a vehicle traveling ahead is calculated from the distance between vehicles obtained every 0.05 second. Specifically, 0.05 second after a taillight image such as shown in Fig. 5(A) has been obtained, the same taillight image is shown in Fig. 5(B), and the distance between taillights 52 and 53 changes from r1 to r2.

Pet. 27 (quoting Ex. 1005, 4).

10

IPR2014-00262
Patent 7,655,894 B2

Magna responds that TRW is "[u]sing an incorrect construction of '*identification of objects* of interest is enhanced'" to support its unpatentability argument.  PO Resp. 9.  Magna asserts that the quoted passage explains how Yanagawa's system calculates the distance between the equipped vehicle and a vehicle traveling ahead, and the relative speed of the vehicle traveling ahead, but does not describe identifying objects of interest or enhancing such identification.  *Id*. at 9–10.  According to Magna, the described distance and speed calculations are unrelated to and separate from the step of recognizing headlights and taillights in Yanagawa, and, in fact, are carried out after Yanagawa's system already has recognized the leading vehicle's taillights.  *Id*. at 10 (citing Ex. 1005, Fig. 3).

TRW does not dispute that the portion of Yanagawa on which it relies to teach this limitation does not involve the actual identification of objects of interest.  Instead, TRW argues that this portion "expressly determines at least two further characteristics of identified taillights and vehicles thereof," i.e. speed of the vehicle and distance to the device vehicle.  Pet. Reply 3 (emphasis omitted).  Further, TRW argues that Yanagawa teaches this limitation even under Magna's interpretation, because "Yanagawa utilizes speed and distance calculation . . . to enhance identification of objects by identifying detected objects as potential rear-end collision objects."  *Id*. at 4.

As an initial matter, there is no dispute that the portion of Yanagawa on which TRW relies teaches "comparing over successive frames image data associated with objects in said forward field of view of said image sensor."  Further, there does not seem to be any dispute that the portion of Yanagawa on which TRW relies describes calculating the relative speed and distance of an object of interest that has already been identified as such.  Therefore, the

IPR2014-00262
Patent 7,655,894 B2

dispute is whether that teaching corresponds to "enhanc[ing]" "identification of objects of interest" as claim 1 requires. We determine that it does not. As discussed above, we construe "identification of objects of interest is enhanced" to mean that the quality of the identification of objects of interest is improved; i.e., that the identification is less likely to be erroneous. But, as Magna correctly points out, Yanagawa's speed and distance calculations of a leading vehicle are independent of its identification of the leading vehicle as an object of interest; nor does Yanagawa teach that such calculations reduce the possibility of error in an identification of an object of interest. *See* PO Resp. 9–10; Ex. 2032 ¶¶ 27–36 (supporting testimony of Matthew A. Turk, Ph.D.).

In its Reply, TRW argues that even under Magna's construction, Yanagawa teaches the "enhanced" limitation. Pet. Reply 4. According to TRW, "Yanagawa utilizes speed and distance calculation . . . to enhance identification of objects by identifying detected objects as potential rear-end collision objects." *Id*. TRW refers to Yanagawa's teaching that "because the distance between vehicles and relative speed have been calculated in this case, these data can be used to predict a potential rear-end collision." *Id*. (quoting Ex. 1005, 005) (emphasis omitted).

As an initial matter, this argument is newly raised in the Reply, and is based on a portion of Yanagawa that TRW alleges, for the first time, corresponds to the *enhanced* limitation. Although the argument is based on Magna's proposed claim construction rather than the construction that TRW proposes in its Reply,[8] we consider the dispute over the proper construction

---

[8] TRW did not propose a construction for the *enhanced* limitation in the Petition.

IPR2014-00262
Patent 7,655,894 B2

of this term to be sufficiently foreseeable so that TRW should have presented the argument and evidence in the Petition. TRW's failure to do so at that time has deprived Magna of the opportunity to respond to it, as Magna could not respond to TRW's Reply. For this reason, we decline to consider it. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) (stating that a reply that belatedly presents evidence will not be considered, and that one indication that a new issue has been raised in a reply is where the petitioner submits "new evidence necessary to make out a *prima facie* case" of unpatentability of an original claim).

Even if we were to consider this argument, however, we would find it unpersuasive. TRW does not point us to anything in Yanagawa that suggests that a previously identified vehicle becomes a new "collision object" when it becomes a collision hazard. Nor do we find any such teaching in the reference. Instead, the vehicle remains a known (i.e., identified) object regardless of its speed and distance relative to the equipped vehicle.

In sum, we determine that TRW has not shown by a preponderance of the evidence that claim 1 would have been obvious over Yanagawa, Vellacott, and Koshizawa.

### 2.    *Claims 2, 3, 5, and 10*

Claims 2, 3, 5, and 10 depend from claim 1, and, therefore, necessarily contain the *enhanced* limitation. TRW relies on its discussion of claim 1 with respect to this limitation in the dependent claims. Pet. 30–34. Therefore, for the reasons set forth above, we determine that TRW has not shown by a preponderance of the evidence that claims 2, 3, 5, and 10 would have been obvious over Yanagawa, Vellacott, and Koshizawa.

IPR2014-00262
Patent 7,655,894 B2

     C.    *Claims 13–16—Obviousness—Yanagawa, Vellacott,*
          *Koshizawa, and Bottesch (Claim 16), Aurora (Claims 13 and*
          *14), or Kawahara (Claim 15)*

Claims 13–16 depend from claim 1, and, therefore, necessarily contain the *enhanced* limitation. TRW relies on its discussion of claim 1 with respect to this limitation in these dependent claims. Pet. 38, 40–44. Therefore, for the reasons set forth above, we determine that TRW has not shown by a preponderance of the evidence that claims 13–16 would have been obvious over Yanagawa, Vellacott, Koshizawa, and Bottesch (claim 16), Aurora (claims 13 and 14), or Kawahara (claim 15).

     D.    *Claims 25, 26, and 28—Obviousness—Yanagawa, Vellacott,*
          *Koshizawa, and Kawahara*

Claim 25 is independent. It does not contain the *enhanced* limitation, but instead recites "wherein a comparison is made by said logic and control circuit of a frame comprising image data to a successor frame in order to identify, at least in part, an object of interest." Claims 26 and 28 depend from claim 25. TRW asserts that the following portion of Yanagawa teaches this limitation:

> The distance between vehicles is calculated in this way every 0.05 second as the image data are stored, and the speed of the device vehicle relative to a vehicle traveling ahead is calculated from the distance between vehicles obtained every 0.05 second. Specifically, 0.05 second after a taillight image such as shown in Fig. 5(A) has been obtained, the same taillight image is shown in Fig. 5(B), and the distance between taillights 52 and 53 changes from r1 to r2.

Pet. 47, 50, 57 (quoting Ex. 1005, 004). This is the same passage on which TRW relies in the Petition as teaching the *enhanced* limitation of claim 1.

IPR2014-00262
Patent 7,655,894 B2

Magna disputes that this portion of Yanagawa teaches this limitation. As it argued with respect to the *enhanced* limitation in claim 1, and based on the same reasoning, Magna argues that this passage "is unrelated to the identification of objects." PO Resp. 21. TRW likewise counters with the same arguments it raised with respect to claim 1. Pet. Reply 5.

Claim 25 expressly requires that the comparison of a frame of image data with a successor frame be for the purpose of "identify[ing], at least in part, an object of interest." For the reasons discussed above in Section II.B.1, we determine that the passage on which TRW relies is not directed to the identification of objects of interest; instead, it describes calculating the relative speed and distance of a previously identified object of interest. Accordingly, for the reasons discuss above, we determine that TRW has not shown by a preponderance of the evidence that claims 25, 26, and 28 would have been obvious over Yanagawa, Vellacott, Koshizawa, and Kawahara.

### III.   CONCLUSION

For the foregoing reasons, we determine that TRW has not shown by a preponderance of the evidence that claims 1–3, 5, 10, 13–16, 25, 26, and 28 of the '894 patent are unpatentable under 35 U.S.C. § 103(a).

### IV.   ORDER

For the reasons given, it is

ORDERED that claims 1–3, 5, 10, 13–16, 25, 26, and 28 of the '894 patent have not been shown to be unpatentable.

15

IPR2014-00262
Patent 7,655,894 B2

This is a Final Decision. Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Josh Snider
A. Justin Poplin
Timothy Sendek
LATHROP & GAGE LLP
patent@lathropgage.com
jpoplin@lathropgage.com
tsendek@lathropgage.com

PATENT OWNER:

David K.S. Cornwell
Jason Eisenberg
Robert Sterne
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
Davidc-PTAB@skgf.com
jasone-PTAB@skgf.com
rsterne-PTAB@skgf.com

Timothy A. Flory
Terence J. Linn
GARDNER, LINN, BURKHART & FLORY, LLP
Flory@glbf.com
linn@glbf.com



US007655894B2

(12) **United States Patent**
Schofield et al.

(10) Patent No.: **US 7,655,894 B2**
(45) Date of Patent: **Feb. 2, 2010**

(54) **VEHICULAR IMAGE SENSING SYSTEM**

(75) Inventors: **Kenneth Schofield**, Holland, MI (US); **Mark L. Larson**, Grand Haven, MI (US); **Keith J. Vadas**, Coopersville, MI (US)

(73) Assignee: **Donnelly Corporation**, Holland, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/273,879**

(22) Filed: **Nov. 19, 2008**

(65) **Prior Publication Data**

US 2009/0072124 A1    Mar. 19, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/626,535, filed on Jan. 24, 2007, now Pat. No. 7,459,664, which is a continuation of application No. 11/545,039, filed on Oct. 6, 2006, now Pat. No. 7,402,786, which is a continuation of application No. 09/441,341, filed on Nov. 16, 1999, now Pat. No. 7,339,149, which is a continuation of application No. 09/135,565, filed on Aug. 17, 1998, now Pat. No. 6,097,023, which is a continuation of application No. 08/621,863, filed on Mar. 25, 1996, now Pat. No. 5,796,094.

(51) **Int. Cl.**
*H01L 27/00* (2006.01)
*G06K 9/00* (2006.01)

(52) **U.S. Cl.** ...................... **250/208.1**; 382/104; 701/27; 701/28

(58) **Field of Classification Search** .............. 250/208.1; 382/104; 701/200, 224, 23, 27, 28; 702/92; 340/901; 348/118
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,632,040 A    3/1953  Rabinow

(Continued)

FOREIGN PATENT DOCUMENTS

DE        2133182    1/1973

(Continued)

OTHER PUBLICATIONS

Decision—Motions—Bd. R. 125(a), issued Aug. 29, 2006 in connection with Interference No. 105,325, which involved U.S. Appl. No. 09/441,341, filed Nov. 16, 1999 by Schofield et al. and U.S. Patent No. 5,837,994, issued to Stam et al.

(Continued)

*Primary Examiner*—Seung C Sohn
(74) *Attorney, Agent, or Firm*—Van Dyke, Gardner, Linn & Burkhart LLP

(57) **ABSTRACT**

An image sensing system for a vehicle includes an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate. The imaging sensor is disposed at an interior portion of the vehicle, and may be at or proximate to an interior rearview mirror assembly of the vehicle. The system includes a logic and control circuit comprising an image processor for processing image data derived from the imaging sensor. The image sensing system may identify objects of interest based on spectral differentiation or by comparing over successive frames image data associated with objects in the forward field of view of the image sensor or by objects of interest being at least one of qualified and disqualified based at least in part on object motion in the field of view of the imaging sensor.

**31 Claims, 11 Drawing Sheets**



**A0475**

**US 7,655,894 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,827,594 A | 3/1958 | Rabinow | |
| 3,141,393 A | 7/1964 | Platt | |
| 3,601,614 A | 8/1971 | Platzer | |
| 3,612,666 A | 10/1971 | Rabinow | |
| 3,665,224 A | 5/1972 | Kelsey | |
| 3,680,951 A | 8/1972 | Jordan | |
| 3,689,695 A | 9/1972 | Rosenfield et al. | |
| 3,708,231 A | 1/1973 | Walters | |
| 3,746,430 A | 7/1973 | Brean | |
| 3,807,832 A | 4/1974 | Castellion | |
| 3,811,046 A | 5/1974 | Levick | |
| 3,813,540 A | 5/1974 | Albrecht | |
| 3,862,798 A | 1/1975 | Hopkins | |
| 3,947,095 A | 3/1976 | Moultrie ....................... 350/302 |
| 3,962,600 A | 6/1976 | Pittman | |
| 3,985,424 A | 10/1976 | Steinacher | |
| 3,986,022 A | 10/1976 | Hyatt | |
| 4,037,134 A | 7/1977 | Löper | |
| 4,052,712 A | 10/1977 | Ohama et al. | |
| 4,093,364 A | 6/1978 | Miller | |
| 4,111,720 A | 9/1978 | Michel et al. | |
| 4,161,653 A | 7/1979 | Bedini | |
| 4,200,361 A | 4/1980 | Malvano | |
| 4,214,266 A | 7/1980 | Myers | |
| 4,236,099 A | 11/1980 | Rosenblum | |
| 4,247,870 A | 1/1981 | Gabel et al. | |
| 4,249,160 A | 2/1981 | Chilvers | |
| 4,266,856 A | 5/1981 | Wainwright | |
| 4,277,804 A | 7/1981 | Robison | |
| 4,281,898 A | 8/1981 | Ochiai | |
| 4,288,814 A | 9/1981 | Talley et al. | |
| 4,355,271 A | 10/1982 | Noack | |
| 4,357,558 A | 11/1982 | Massoni et al. | |
| 4,381,888 A | 5/1983 | Momiyama ................. 350/458 |
| 4,420,238 A | 12/1983 | Felix | |
| 4,431,896 A | 2/1984 | Lodetti | |
| 4,443,057 A | 4/1984 | Bauer | |
| 4,460,831 A | 7/1984 | Oettinger et al. | |
| 4,481,450 A | 11/1984 | Watanabe et al. ........... 318/444 |
| 4,491,390 A | 1/1985 | Tong-Shen | |
| 4,512,637 A | 4/1985 | Ballmer | |
| 4,529,275 A | 7/1985 | Ballmer | |
| 4,529,873 A | 7/1985 | Ballmer | |
| 4,549,208 A | 10/1985 | Kamejima et al. | |
| 4,571,082 A | 2/1986 | Downs | |
| 4,572,619 A | 2/1986 | Reininger | |
| 4,580,875 A | 4/1986 | Bechtel | |
| 4,603,946 A | 8/1986 | Kato | |
| 4,614,415 A | 9/1986 | Hyatt | |
| 4,620,141 A | 10/1986 | McCumber et al. ......... 318/483 |
| 4,623,222 A | 11/1986 | Itoh | |
| 4,626,850 A | 12/1986 | Chey | |
| 4,629,941 A | 12/1986 | Ellis | |
| 4,630,109 A | 12/1986 | Barton | |
| 4,632,509 A | 12/1986 | Ohmi | |
| 4,647,161 A | 3/1987 | Müller ....................... 350/462 |
| 4,653,316 A | 3/1987 | Fukuhara | |
| 4,669,825 A | 6/1987 | Itoh | |
| 4,669,826 A | 6/1987 | Itoh | |
| 4,671,615 A | 6/1987 | Fukada | |
| 4,672,457 A | 6/1987 | Hyatt | |
| 4,676,601 A | 6/1987 | Itoh | |
| 4,690,508 A | 9/1987 | Jacob | |
| 4,692,798 A | 9/1987 | Seko et al. | |
| 4,697,883 A | 10/1987 | Suzuki | |
| 4,701,022 A | 10/1987 | Jacob | |
| 4,713,685 A | 12/1987 | Nishimura et al. | |
| 4,727,290 A | 2/1988 | Smith et al. | |
| 4,731,669 A | 3/1988 | Hayashi et al. | |
| 4,741,603 A | 5/1988 | Miyagi | |
| 4,768,135 A | 8/1988 | Kretschmer et al. | |
| 4,789,904 A | 12/1988 | Peterson | |
| 4,793,690 A | 12/1988 | Gahan | |
| 4,817,948 A | 4/1989 | Simonelli | |
| 4,820,933 A | 4/1989 | Hong | |
| 4,825,232 A | 4/1989 | Howdle | |
| 4,838,650 A | 6/1989 | Stewart | |
| 4,847,772 A | 7/1989 | Michalopoulos et al. | |
| 4,862,037 A | 8/1989 | Farber et al. | |
| 4,867,561 A | 9/1989 | Fujii et al. ................... 356/237 |
| 4,871,917 A | 10/1989 | O'Farrell et al. | |
| 4,872,051 A | 10/1989 | Dye | |
| 4,881,019 A | 11/1989 | Shiraishi et al. | |
| 4,886,960 A | 12/1989 | Molyneux | |
| 4,891,559 A | 1/1990 | Matsumoto et al. | |
| 4,892,345 A | 1/1990 | Rachael, III | |
| 4,895,790 A | 1/1990 | Swanson et al. ........... 430/321 |
| 4,896,030 A | 1/1990 | Miyaji | |
| 4,910,591 A | 3/1990 | Petrossian et al. | |
| 4,916,374 A | 4/1990 | Schierbeek | |
| 4,917,477 A | 4/1990 | Bechtel et al. | |
| 4,937,796 A | 6/1990 | Tendler | |
| 4,956,591 A | 9/1990 | Schierbeek | |
| 4,961,625 A | 10/1990 | Wood et al. | |
| 4,967,319 A | 10/1990 | Seko | |
| 4,970,653 A | 11/1990 | Kenue | |
| 4,974,078 A | 11/1990 | Tsai | |
| 4,987,357 A | 1/1991 | Masaki | |
| 4,991,054 A | 2/1991 | Walters | |
| 5,001,558 A | 3/1991 | Burley et al. | |
| 5,003,288 A | 3/1991 | Wilhelm | |
| 5,012,082 A | 4/1991 | Watanabe | |
| 5,016,977 A | 5/1991 | Baude et al. ........... 350/162.17 |
| 5,027,001 A | 6/1991 | Torbert ...................... 307/10.1 |
| 5,027,200 A | 6/1991 | Petrossian et al. | |
| 5,044,706 A | 9/1991 | Chen ...................... 359/357 |
| 5,055,668 A | 10/1991 | French | |
| 5,059,877 A | 10/1991 | Teder ...................... 318/444 |
| 5,064,274 A | 11/1991 | Alten | |
| 5,072,154 A | 12/1991 | Chen | |
| 5,086,253 A | 2/1992 | Lawler | |
| 5,096,287 A | 3/1992 | Kakinami et al. | |
| 5,121,200 A | 6/1992 | Choi | |
| 5,124,549 A | 6/1992 | Michaels et al. | |
| 5,148,014 A | 9/1992 | Lynam | |
| 5,168,378 A | 12/1992 | Black | |
| 5,170,374 A | 12/1992 | Shimohigashi et al. | |
| 5,172,235 A | 12/1992 | Wilm et al. | |
| 5,182,502 A | 1/1993 | Slotkowski et al. | |
| 5,184,956 A | 2/1993 | Langlais et al. | |
| 5,193,029 A | 3/1993 | Schofield | |
| 5,204,778 A | 4/1993 | Bechtel | |
| 5,208,701 A | 5/1993 | Maeda ...................... 359/574 |
| 5,245,422 A | 9/1993 | Borcherts et al. | |
| 5,253,109 A | 10/1993 | O'Farrell | |
| 5,276,389 A | 1/1994 | Levers | |
| 5,289,182 A | 2/1994 | Brillard et al. | |
| 5,289,321 A | 2/1994 | Secor | |
| 5,305,012 A | 4/1994 | Faris | |
| 5,307,136 A | 4/1994 | Saneyoshi | |
| 5,313,072 A | 5/1994 | Vachss | |
| 5,325,096 A | 6/1994 | Pakett | |
| 5,325,386 A | 6/1994 | Jewell et al. | |
| 5,329,206 A | 7/1994 | Slotkowski et al. | |
| 5,331,312 A | 7/1994 | Kudoh | |
| 5,336,980 A | 8/1994 | Levers ...................... 318/444 |
| 5,341,437 A | 8/1994 | Nakayama | |
| 5,351,044 A | 9/1994 | Mathur et al. | |
| 5,355,118 A | 10/1994 | Fukuhara | |
| 5,374,852 A | 12/1994 | Parkes | |
| 5,386,285 A | 1/1995 | Asayama | |
| 5,406,395 A | 4/1995 | Wilson et al. ................. 359/15 |
| 5,410,346 A | 4/1995 | Saneyoshi et al. | |
| 5,414,257 A | 5/1995 | Stanton .................. 250/227.25 |

**US 7,655,894 B2**

Page 3

| | | | |
|---|---|---|---|
| 5,414,461 A | 5/1995 | Kishi et al. ................ 348/115 |
| 5,416,318 A | 5/1995 | Hegyi |
| 5,424,952 A | 6/1995 | Asayama ..................... 364/443 |
| 5,426,294 A | 6/1995 | Kobayashi et al. |
| 5,430,431 A | 7/1995 | Nelson |
| 5,440,428 A | 8/1995 | Hegg et al. |
| 5,444,478 A | 8/1995 | Lelong et al. |
| 5,451,822 A | 9/1995 | Bechtel et al. |
| 5,457,493 A | 10/1995 | Leddy et al. |
| 5,461,357 A | 10/1995 | Yoshioka et al. |
| 5,461,361 A | 10/1995 | Moore |
| 5,469,298 A | 11/1995 | Suman et al. |
| 5,471,515 A | 11/1995 | Fossum et al. |
| 5,475,494 A | 12/1995 | Nishida et al. |
| 5,487,116 A | 1/1996 | Nakano et al. |
| 5,498,866 A | 3/1996 | Bendicks et al. ........ 250/227.25 |
| 5,510,983 A | 4/1996 | Iino |
| 5,515,448 A | 5/1996 | Nishitani |
| 5,528,698 A | 6/1996 | Kamei et al. |
| 5,529,138 A | 6/1996 | Shaw et al. |
| 5,530,420 A | 6/1996 | Tsuchiya et al. ........... 340/435 |
| 5,530,771 A * | 6/1996 | Maekawa ................... 382/103 |
| 5,535,314 A | 7/1996 | Alves et al. |
| 5,537,003 A | 7/1996 | Bechtel et al. |
| 5,539,397 A | 7/1996 | Asanuma et al. |
| 5,541,590 A | 7/1996 | Nishio |
| 5,550,677 A | 8/1996 | Schofield et al. ........... 359/604 |
| 5,555,312 A | 9/1996 | Shima et al. |
| 5,555,555 A * | 9/1996 | Sato et al. .................. 382/104 |
| 5,568,027 A | 10/1996 | Teder |
| 5,574,443 A | 11/1996 | Hsieh |
| 5,614,788 A | 3/1997 | Mullins |
| 5,627,586 A * | 5/1997 | Yamasaki ................... 348/169 |
| 5,634,709 A | 6/1997 | Iwama |
| 5,638,116 A * | 6/1997 | Shimoura et al. .......... 348/118 |
| 5,648,835 A | 7/1997 | Uzawa ....................... 396/429 |
| 5,650,944 A | 7/1997 | Kise |
| 5,660,454 A | 8/1997 | Mori et al. |
| 5,661,303 A | 8/1997 | Teder ....................... 250/341.8 |
| 5,670,935 A | 9/1997 | Schofield et al. ........... 340/461 |
| 5,675,489 A | 10/1997 | Pomerleau |
| 5,757,949 A | 5/1998 | Kinoshita et al. |
| 5,760,826 A | 6/1998 | Nayer ........................ 348/36 |
| 5,760,828 A | 6/1998 | Cortes ....................... 348/143 |
| 5,760,931 A | 6/1998 | Saburi et al. |
| 5,760,962 A | 6/1998 | Schofield et al. |
| 5,765,116 A | 6/1998 | Wilson-Jones et al. |
| 5,781,437 A | 7/1998 | Wiemer et al. |
| 5,790,403 A | 8/1998 | Nakayama |
| 5,793,308 A | 8/1998 | Rosinski et al. |
| 5,793,420 A | 8/1998 | Schmidt |
| 5,796,094 A | 8/1998 | Schofield et al. .......... 250/208.1 |
| 5,798,575 A | 8/1998 | O'Farrell et al. |
| 5,837,994 A | 11/1998 | Stam et al. ................ 250/208.1 |
| 5,844,682 A | 12/1998 | Kiyomoto et al. |
| 5,845,000 A | 12/1998 | Breed et al. |
| 5,848,802 A | 12/1998 | Breed et al. |
| 5,850,176 A | 12/1998 | Kinoshita et al. ........... 340/435 |
| 5,850,254 A | 12/1998 | Takano et al. |
| 5,867,591 A | 2/1999 | Onda ......................... 382/154 |
| 5,877,897 A | 3/1999 | Schofield et al. |
| 5,883,739 A | 3/1999 | Ashihara et al. ........... 359/462 |
| 5,890,021 A | 3/1999 | Onoda ....................... 396/121 |
| 5,896,085 A | 4/1999 | Mori et al. ................. 340/469 |
| 5,923,027 A | 7/1999 | Stam et al. ................ 250/208.1 |
| 5,949,331 A | 9/1999 | Schofield et al. ........... 340/461 |
| 5,959,555 A | 9/1999 | Furuta |
| 5,963,247 A | 10/1999 | Banitt |
| 5,990,469 A | 11/1999 | Bechtel et al. ............ 250/208.1 |
| 6,020,704 A | 2/2000 | Buschur ..................... 318/483 |
| 6,049,171 A | 4/2000 | Stam et al. ................. 315/82 |
| 6,066,933 A | 5/2000 | Ponziana |
| 6,084,519 A | 7/2000 | Coulling et al. |
| 6,087,953 A | 7/2000 | DeLine et al. ............ 340/815.4 |
| 6,097,023 A | 8/2000 | Schofield et al. |
| 6,097,024 A | 8/2000 | Stam et al. ................ 250/208.1 |
| 6,124,886 A | 9/2000 | DeLine et al. ............... 348/148 |
| 6,144,022 A | 11/2000 | Tenenbaum et al. ....... 250/208.1 |
| 6,172,613 B1 | 1/2001 | DeLine et al. ............ 340/815.4 |
| 6,201,642 B1 | 3/2001 | Bos ............................. 359/565 |
| 6,222,447 B1 | 4/2001 | Schofield et al. ......... 340/461 |
| 6,243,003 B1 | 6/2001 | DeLine et al. |
| 6,302,545 B1 | 10/2001 | Schofield et al. |
| 6,313,454 B1 | 11/2001 | Bos et al. |
| 6,320,176 B1 | 11/2001 | Schofield et al. |
| 6,396,397 B1 | 5/2002 | Schofield et al. |
| 6,411,328 B1 | 6/2002 | Franke et al. |
| 6,424,273 B1 | 7/2002 | Gutta et al. ................. 340/937 |
| 6,433,676 B2 | 8/2002 | DeLine et al. |
| 6,442,465 B2 | 8/2002 | Breed et al. |
| 6,498,620 B2 | 12/2002 | Schofield et al. |
| 6,523,964 B2 | 2/2003 | Schofield et al. |
| 6,534,884 B2 | 3/2003 | Marcus et al. ............ 307/10.1 |
| 6,553,130 B1 | 4/2003 | Lemelson et al. .......... 382/104 |
| 6,559,435 B2 | 5/2003 | Schofield et al. |
| 6,611,202 B2 | 8/2003 | Schofield et al. |
| 6,636,258 B2 | 10/2003 | Strumolo ................... 348/149 |
| 6,650,233 B2 | 11/2003 | DeLine et al. |
| 6,672,731 B2 | 1/2004 | Schnell et al. ............. 359/877 |
| 6,717,610 B1 | 4/2004 | Bos et al. ................... 348/148 |
| 6,802,617 B2 | 10/2004 | Schofield et al. |
| 6,822,563 B2 | 11/2004 | Bos et al. |
| 6,831,261 B2 | 12/2004 | Schofield et al. |
| 6,891,563 B2 | 5/2005 | Schofield et al. |
| 6,953,253 B2 | 10/2005 | Schofield et al. |
| 6,975,775 B2 | 12/2005 | Rykowski et al. |
| 7,062,300 B1 | 6/2006 | Kim |
| 7,227,459 B2 | 6/2007 | Bos et al. |
| 7,459,664 B2 | 12/2008 | Schofield et al. |
| 2002/0015153 A1 | 2/2002 | Downs |
| 2002/0126875 A1 | 9/2002 | Naoi et al. |
| 2004/0051634 A1 | 3/2004 | Schofield et al. |
| 2004/0114381 A1 | 6/2004 | Salmeen et al. |
| 2004/0200948 A1 | 10/2004 | Bos et al. |
| 2005/0146792 A1 | 7/2005 | Schofield et al. |
| 2005/0200700 A1 | 9/2005 | Schofield et al. |
| 2006/0018832 A1 | 1/2006 | Stam et al. |
| 2006/0018511 A1 | 1/2006 | Stam et al. |
| 2006/0018512 A1 | 1/2006 | Stam et al. |
| 2006/0028731 A1 | 2/2006 | Schofield et al. |
| 2006/0091813 A1 | 5/2006 | Stam et al. |
| 2007/0023613 A1 | 2/2007 | Schofield et al. |
| 2007/0109406 A1 | 5/2007 | Schofield et al. |
| 2007/0109651 A1 | 5/2007 | Schofield et al. |
| 2007/0109652 A1 | 5/2007 | Schofield et al. |
| 2007/0109653 A1 | 5/2007 | Schofield et al. |
| 2007/0109654 A1 | 5/2007 | Schofield et al. |
| 2007/0120657 A1 | 5/2007 | Schofield et al. |
| 2007/0176080 A1 | 8/2007 | Schofield et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2808260 | 8/1979 |
| DE | 3041612 | 11/1980 |
| DE | P2931368 A1 | 2/1981 |
| DE | 2946561 A | 5/1981 |
| DE | 3041692 | 5/1981 |
| DE | 3248511 A1 | 7/1984 |
| DE | 4107965 A1 | 9/1991 |
| DE | 4118208 | 11/1991 |
| DE | 4139515 A1 | 6/1992 |
| DE | 4123641 A1 | 1/1993 |
| EP | 48506 | 6/1985 |
| EP | 0202460 | 11/1986 |
| EP | 48810 | 10/1988 |
| EP | 0416222 A2 | 3/1991 |

**US 7,655,894 B2**

Page 4

| | | |
|---|---|---|
| EP | 0426503 | 5/1991 |
| EP | 0450553 A2 | 10/1991 |
| EP | 0492591 | 7/1992 |
| EP | 0513476 A1 | 11/1992 |
| EP | 0788947 | 8/1997 |
| EP | 0830267 B1 | 12/2001 |
| FR | 2241085 | 4/1973 |
| FR | 2513198 | 3/1983 |
| FR | 2585991 | 2/1987 |
| FR | 2 641 237 A1 | 7/1990 |
| FR | 2672857 | 8/1992 |
| FR | 2673499 | 9/1992 |
| FR | 2726144 | 4/1996 |
| GB | 934037 | 8/1963 |
| GB | 1535182 | 12/1978 |
| GB | 2029343 | 3/1980 |
| GB | 2119087 | 11/1983 |
| GB | 2137373 | 10/1984 |
| GB | 2137573 A | 10/1984 |
| GB | 2156295 | 10/1985 |
| GB | 2244187 A | 11/1991 |
| GB | 2255539 A | 11/1992 |
| GB | 2327823 A | 2/1999 |
| JP | 5630305 | 8/1979 |
| JP | 55039843 | 3/1980 |
| JP | 57-173801 | 10/1982 |
| JP | 57-208530 | 12/1982 |
| JP | 58-19941 | 12/1982 |
| JP | 57-208531 | 2/1983 |
| JP | 58110334 | 6/1983 |
| JP | 58209635 | 12/1983 |
| JP | 59-51325 | 3/1984 |
| JP | 5951301 | 4/1984 |
| JP | 59114139 | 7/1984 |
| JP | 59133336 | 9/1984 |
| JP | 6080953 | 5/1985 |
| JP | 0-212730 | 10/1985 |
| JP | 60166651 | 11/1985 |
| JP | 60261275 | 12/1985 |
| JP | 6154942 | 4/1986 |
| JP | 6156638 | 4/1986 |
| JP | 6243543 | 2/1987 |
| JP | 62-131837 | 6/1987 |
| JP | 62122447 | 6/1987 |
| JP | 62122844 | 6/1987 |
| JP | 6414700 | 1/1989 |
| JP | 01123587 | 5/1989 |
| JP | 30061192 | 3/1991 |
| JP | 03099952 | 4/1991 |
| JP | 042394 | 11/1991 |
| JP | 3284413 | 12/1991 |
| JP | 417386 | 4/1992 |
| JP | 4114587 | 4/1992 |
| JP | 40245886 | 9/1992 |
| JP | 50000638 | 1/1993 |
| JP | 0550883 | 3/1993 |
| JP | 0577657 | 3/1993 |

| | | |
|---|---|---|
| JP | 5213113 | 8/1993 |
| JP | 6107035 | 4/1994 |
| JP | 6227318 | 8/1994 |
| JP | 06-267304 | 9/1994 |
| JP | 06276524 A | 9/1994 |
| JP | 06-295601 | 10/1994 |
| JP | 074170 | 1/1995 |
| JP | 7-32936 | 2/1995 |
| JP | 7-47878 | 2/1995 |
| JP | 7-052706 | 2/1995 |
| JP | 7-69125 | 3/1995 |
| JP | 07105496 | 4/1995 |
| JP | 08166221 | 6/1996 |
| JP | 2630604 | 4/1997 |
| WO | WO 86/05147 | 9/1986 |
| WO | WO-9419212 A | 9/1994 |
| WO | 9427262 | 11/1994 |
| WO | WO 9621581 A | 7/1996 |
| WO | 9638319 | 12/1996 |
| WO | WO9735743 | 10/1997 |
| WO | 9814974 | 4/1998 |
| WO | 9914088 | 3/1999 |
| WO | 9923828 | 5/1999 |

OTHER PUBLICATIONS

Reexamination Control No. 90/007,519, Reexamination of U.S. Patent No. 6,222,447, issued to Schofield et al.

Reexamination Control No. 90/007,520, Reexamination of U.S. Patent No. 5,949,331, issued to Schofield et al.

Search Report from European Patent Application No. EP 96 91 6533.

Kobe, Gerry, "Hypnotic Wizardry! (interior electronics)," *Automotive Industries*, vol. 169, No. 5, p. 60, published May 1989. Relevant section is entitled Instrumentation.

SAE Information Report, "Vision Factors Considerations in Rear View Mirror Design—SAE J985 Oct. 1988," approved Oct. 1988, and located in *1995 SAE Handbook*, vol. 3.

Hamit, Francis "360-Degree Interactivity: New Video and Still Cameras Provide a Global Roaming Viewpoint", *Advanced Imaging*, Mar. 1997, p. 50.

Johannes, Laura "A New Microchip Ushers in Cheaper Digital Cameras", *The Wall Street Journal*, Aug. 21, 1998, p. B1.

Article entitled "Generation of Vision Technology," published by VLSI Vision Limited, publication date unknown.

Article entitled "On-Chip CMOS Sensors for VLSI Imaging Systems," published by VLSI Vision Limited, 1991.

Wang, G., et al. "CMOS Video Cameras", IEEE, 1991, p. 100-103.

Ballard, Dana H. et al., "Computer Vision", 1982, p. 88-89, sect. 3.4.1.

Reexamination Control No. 90/007,519, Reexamination of U.S. Patent No. 6,222,447, issued to Schofield et al., Apr. 22, 2005.

Reexamination Control No. 90/007,520, Reexamination of U.S. Patent No. 5,949,331, issued to Schofield et al., Apr. 22, 2005.

Search Report from European Patent Application No. EP 96 91 6533, Nov. 17, 1998.

* cited by examiner



FIG.1

FORWARD
FIELD OF VIEW

VEHICLE
LIGHTING
CONTROL
LOGIC

DSP

FIG.2

1002-005

**A0479**



FIG.3

1002-006

A0480



FIG.4

FIG.5

1002-007



FIG. 8c

FIG. 6

1002-008

A0482



FIG.7a

FIG.7b

1002-009

A0483



TO FIG.7d

FIG.7c

FIG.7d

1002-010



FIG.8a



FIG.8b

1002-011



FIG.9

1002-012



FIG. 10

1002-013



FIG.11a

FIG.11b

FIG.11c

1002-014

NORMAL (DRY) CONDITIONS:



FIG.12a

FOGGY CONDITIONS:



FIG.12b

1002-015

A0489

US 7,655,894 B2

1

**VEHICULAR IMAGE SENSING SYSTEM**

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/626,535, filed Jan. 24, 2007, now U.S. Pat. No. 7,459,664, which is a continuation of U.S. patent application Ser. No. 11/545,039, filed Oct. 6, 2006, now U.S. Pat. No. 7,402,786, which is a continuation of U.S. patent application Ser. No. 09/441,341, filed Nov. 16, 1999, now U.S. Pat. No. 7,339,149, which is a continuation of U.S. patent application Ser. No. 09/135,565, filed Aug. 17, 1998, now U.S. Pat. No. 6,097,023, which is a continuation of U.S. patent application Ser. No. 08/621,863, filed Mar. 25, 1996, now U.S. Pat. No. 5,796,094.

BACKGROUND OF THE INVENTION

This invention relates generally to vehicle control systems and, in particular, to a system and method for controlling the headlights of the vehicles. The invention is particularly adapted to controlling the vehicle's headlamps in response to sensing the headlights of oncoming vehicles and taillights of leading vehicles.

It has long been a goal to automatically control the state of a vehicle's headlights in order to accomplish automatically that which is manually performed by the driver. In particular, the driver of a vehicle whose headlights are in a high-beam state will dim the headlights upon conscious realization that the headlights are a distraction to the driver of an oncoming vehicle or a leading vehicle. It is desirable to relieve the driver of such duties and thereby allow the driver to concentrate on the driving task at hand. The ideal automatic control would also facilitate the use of high beams in conditions which allow their use, increasing the safety for the controlled vehicle as well as reducing the hazard caused by the occasional failure of the driver to dim the headlights when such headlights are distracting another driver.

Prior attempts at vehicle headlight dimming controls have included a single light sensor which integrates light in the scene forward of the vehicle. When the integrated light exceeds a threshold, the vehicle headlights are dimmed. Such approaches have been ineffective. The headlights of oncoming vehicles are, at least from a distance, point sources of light. In order to detect such light sources in an integrated scene, it is necessary to set a sufficiently low threshold of detection that many non-point-sources at lower intensities are interpreted as headlights or taillights. Such prior art vehicle headlight dimming controls have also been ineffective at reliably detecting the taillights of leading vehicles. The apparent reason is that the characteristics of these two light sources; for example, intensity, are so different that detecting both has been impractical. In order to overcome such deficiencies, additional solutions have been attempted, such as the use of infrared filtering, baffling of the optic sensor, and the like. While such modifications may have improved performance somewhat, the long-felt need for a commercially useful vehicle headlight dimming control has gone unmet.

SUMMARY OF THE INVENTION

The present invention provides a vehicle control which is capable of identifying unique characteristics of light sources based upon a precise evaluation of light source characteristics made in each portion of the scene forward of the vehicle, in the vicinity of each light source, by separating each light source from the remainder of the scene and analyzing that source to determine its characteristics. One characteristic used in identifying a light source is the spectral characteristics

2

of that source which is compared with spectral signatures of known light sources, such as those of headlights and taillights. Another characteristic used in identifying a light source is the spatial layout of the light source. By providing the ability to identify the headlights of oncoming vehicles and the taillights of leading vehicles, the state of the headlights of the controlled vehicle may be adjusted in response to the presence or absence of either of these light sources or the intensity of these light sources.

This is accomplished according to an aspect of the invention by providing an imaging sensor which divides the scene forward of the vehicle into a plurality of spatially separated sensing regions. A control circuit is provided that is responsive to the photosensors in order to determine if individual regions include light levels having a particular intensity. The control circuit thereby identifies particular light sources and provides a control output to the vehicle that is a function of the light source identified. The control output may control the dimmed state of the vehicle's headlamps.

In order to more robustly respond to the different characteristics of headlights and taillights, a different exposure period is provided for the array in order to detect each light source. In particular, the exposure period may be longer for detecting leading taillights and significantly shorter for detecting oncoming headlights.

According to another aspect of the invention, a solid-state light imaging array is provided that is made up of a plurality of sensors arranged in a matrix on at least one semiconductor substrate. The light-imaging array includes at least one spectral separation device, wherein each of the sensors responds to light in a particular spectral region. The control circuit responds to the plurality of sensors in order to determine if spatially adjacent regions of the field of view forward of the vehicle include light of a particular spectral signature above a particular intensity level. In this manner, the control identifies light sources that are either oncoming headlights or leading taillights by identifying such light sources according to their spectral makeup.

According to another aspect of the invention, a solid-state light-imaging array is provided that is made up of a plurality of sensors that divide the scene forward of the vehicle into spatially separated regions, and light sources are identified, at least in part, according to their spatial distribution across the regions. This aspect of the invention is based upon a recognition that headlights of oncoming vehicles and taillights of leading vehicles are of interest to the control, irrespective of separation distance from the controlled vehicle, if the source is on the central axis of travel of the vehicle. Oncoming headlights and leading taillights may also be of interest away from this axis, or off axis, but only if the source has a higher intensity level and is spatially larger. These characteristics of headlights and taillights of interest may be taken into consideration by increasing the resolution of the imaging array along this central axis or by increasing the detection threshold off axis, or both. Such spatial evaluation may be implemented by selecting characteristics of an optical device provided with the imaging sensor, such as providing increased magnification central of the forward scene, or providing a wide horizontal view and narrow vertical view, or the like, or by arrangement of the sensing circuitry, or a combination of these.

The present invention provides a vehicle headlight control which is exceptionally discriminating in identifying oncoming headlights and leading taillights in a commercially viable system which ignores other sources of light including streetlights and reflections of the controlled vehicle's headlights off signs, road markers, and the like. The present invention further provides a sensor having the ability to preselect data from the scene forward of the vehicle in order to reduce the input data set to optimize subsequent data processing. The

1002-016

US 7,655,894 B2

3

invention is especially adapted for use with, but not limited to, photoarray imaging sensors, such as CMOS and CCD arrays.

These and other objects, advantages, and features of this invention will become apparent upon review of the following specification in conjunction with the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side elevation of a portion of a vehicle embodying the invention;

FIG. 2 is a partial side elevation view and block diagram of a vehicle headlight dimming control system according to the invention;

FIG. 3 is a block diagram of the control system in FIG. 2;

FIG. 4 is a layout of a light-sensing array useful with the invention;

FIG. 5 is a block diagram of an imaging sensor;

FIG. 6 is an alternative embodiment of an imaging sensor;

FIGS. 7a-7d are a flowchart of a control program;

FIGS. 8a-8c are spectral charts illustrating spectra regions useful with the invention;

FIG. 9 is the same view as FIG. 3 of another alternative embodiment;

FIG. 10 is the same view as FIG. 2 of an alternative mounting arrangement;

FIGS. 11a-11c are views forward of a vehicle illustrating different forms of spatial filtering; and

FIGS. 12a and 12b are illustrations of use of the invention to detect particular atmospheric conditions.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now specifically to the drawings and the illustrative embodiments depicted therein, a vehicle 10 includes a vehicle headlight dimming control 12 made up of an imaging sensor module 14 which senses light from a scene forward of vehicle 10, an imaging control circuit 13 which receives data from sensor 14, and a vehicle lighting control logic module 16 which exchanges data with control circuit 13 and controls headlamps 18 for the purpose of modifying the headlight beam (FIGS. 1 and 2). Such control may be a binary control of the aim of the beam, such as by switching between lamps or lamp filaments, or may be a continuous variation of the aim of a single lamp more or less forward of the vehicle. The control may also control the intensity or pattern of the beam. Additionally, the lights of a vehicle equipped with daytime running lights may be switched between a daytime running light condition and a low-beam condition. Vehicle headlight dimming control 12 can perform a wide range of additional control operations on the vehicle, including turning the headlights ON and OFF, modifying the light intensity of the instrument panel, and providing an input to an electro-optic mirror system.

Vehicle lighting control logic module 16 receives an input 20 from imaging control circuit 13. In particular embodiments, such as ones which adjust the state of the headlights between continuously variable states, module 16 may supply data to imaging control circuit 13, such as the speed of the vehicle, which may be combined with the data sensed by imaging sensor 14 in establishing the state of headlights 18. In the illustrated embodiment, imaging sensor module 14 may be fixedly mounted in a housing 28 by a bracket 34 mounted to, or near, the vehicle's windshield 32. Bracket 34 also mounts an interior rearview mirror 30. This is a preferred mounting for imaging sensor module 14 because the location within the interior of the vehicle substantially eliminates environmental dirt and moisture from fouling the light sensor module. Additionally, the position behind windshield 32, which typically is kept relatively clear through the use of

4

washers and wipers and the like, ensures a relatively clear view of the scene forward of vehicle 10. Alternatively, imaging sensor module 14 may be mounted within a housing 29 of interior rearview mirror 30 facing forward with respect to vehicle 10 (FIG. 10). In such embodiment, control circuit 13 may be combined with the circuit which controls the partial reflectance level of mirror 30 if mirror 30 is an electro-optic mirror such as an electrochromic mirror. Other mounting techniques for sensor module 14 will be apparent to the skilled artisan.

Imaging sensor module 14 includes an optical device 36, such as a lens, an array 38 of photon-accumulating light sensors, and a spectral separation device for separating light from the scene forward of vehicle 10 into a plurality of spectral bands, such as a filter array 40 disposed between optical device 36 and light-sensing array 38. Light-sensing array 38 is described in detail in co-pending application Ser. No. 08/023,918 filed Feb. 26, 1993, by Kenneth Schofield and Mark Larson for an AUTOMATIC REARVIEW MIRROR SYSTEM USING A PHOTOSENSOR ARRAY, now U.S. Pat. No. 5,550,677, the disclosure of which is hereby incorporated herein by reference. Light-sensing array 36 includes a plurality of photosensor elements 42 arranged in a matrix of columns and rows (FIG. 4). In the illustrated embodiment, an array of 512 rows and 512 columns of light-sensing pixels, each made up of a photosensor element 42 is utilized. However, a greater or lesser number of photosensor elements may be utilized and may be arranged in matrix that is laid out in other than columns and rows. Each photosensor element 42 is connected to a common word-line 44. To access the photosensor array, a vertical shift register 46 generates word-line signals to each word-line 44 to enable each row of photosensor elements 42. Each column of photosensor elements is also connected to a bit-line 48 which is connected to an amplifier 50. As each word-line 44 is accessed, a horizontal shift register 52 uses a line 54 to output the bit-line signals on consecutive bit lines 48 to an output line 56. In this manner, each photosensor element 42 may be individually accessed by appropriate manipulation of shift registers 46 and 52. Output 56 is supplied to a digital signal processor 13 which is supplied on an output 62 as input to control circuit 13 (FIGS. 3-5).

Digital signal processor 13 includes an analog-to-digital converter 58 which receives the output 56 of array 36 and converts the analog pixel values to digital values. A digital output 68 of A/D converter 58 is supplied to a taillight detection circuit 76, a headlight detection circuit 78, and to ambient sense logic circuit 84. A detection control circuit 72 supplies control and timing signals on a line 74 which is supplied to array 38, A/D converter 58 taillight detection circuit 76, headlight detection circuit 78, and ambient sense logic 84. Such signals coordinate the activities of these modules and provide any data, from look-up tables provided in control circuit 72, needed by each circuit to perform its function. For example, control circuit 72 may provide intensity threshold levels to taillight detection circuit 76 and headlight detection circuit 78.

Taillight detection circuit 76 detects a red light source having an intensity above a particular threshold as follows. For each pixel that is "red," a comparison is made with adjacent "green" pixels and "blue" pixels. If the intensity of a red pixel is more than a particular number of times the intensity of the adjacent green pixel and adjacent blue pixel, then it is determined that the light source is red. If the intensity of the "red" light source is greater than a particular threshold, an indication is provided at 80.

Headlight detection circuit 78 detects a white light source having an intensity above a particular threshold as follows. A white light is a combination of red, green, and blue components. If adjacent "red," "green," and "blue" pixels all exceed

1002-017

**A0491**

US 7,655,894 B2

5

a particular threshold, a ratio comparison is made of the pixels. If the ratio of the intensity of the adjacent "red," "green," and "blue" pixels is within a particular range, such as 20 percent by way of example, then a white light source is detected.

Vehicle headlight dimming control 12 additionally includes an ambient light-sensing circuit 84 which receives an input from digital output signal 68, Ambient detection circuit 84 samples a subset of photosensor elements and detects light levels sensed by the subset over a long period of time in order to produce significant time filtration. Preferably, the photosensor elements in the sensed subset include sensors that detect portions of the forward-looking scene that are just above the earth's horizon which is more indicative of the ambient light condition. Ambient detection circuit 84 produces an indication 88 of ambient light levels which is supplied as an input to a lighting control module 90. A high ambient light level may be used by a module 90 to inhibit headlight actuation or to switch headlights 18 to a daytime running light mode. Ambient detection circuit 84 can, optionally, perform other functions, such as switching the daytime running lights of the vehicle between daytime and nighttime modes, controlling the intensity of the vehicle's instrument panel and providing an input to an electro-optic rearview mirror system.

Indications 80 and 82 from the light detection units and indication 88 from ambient detection circuit 84 are supplied to a lighting control circuit 90 which produces a first indication 92 that headlights 18 are to be switched on, or switched from a daytime running condition to a night mode, and a high-beam enable indication 94 that the headlights may be switched to a high-beam state. Vehicle lighting control logic module 16 responds to indications 92 and 94 by switching headlights 18 to an appropriate mode. An output 96 from module 16 may be provided to supply lighting control circuit 90 with information with respect to vehicle telemetry, steering, speed, and any other parameter that may be incorporated into the algorithm to determine the state of the headlights of the vehicle. Digital signal processor 13 may be implemented using discrete digital circuit modules or with a suitably programmed micro-processor with input and output buffers.

In one embodiment, an imaging sensor module 14a includes a single photosensor array 38a, one spectral filter array 40a, and one optical device 36a (FIG. 5). In this illustrated embodiment, spectral filter array 40a includes alternating spectrum filter elements for exposing adjacent pixels to different regions of the electromagnetic spectrum in the red band or green band or blue band. This may be accomplished by arranging such filter elements in stripes or by alternating filter spectral regions in a manner known in the art. Digital signal processor 13a captures a frame of data by enabling photosensor array 38a for a particular exposure period during which each photosensor element 42 accumulates photons. In order to detect oncoming headlights, digital signal processor 13a enables photosensor array 38a for a first exposure period. In order to detect leading taillights, digital signal processor 13a enables photosensor array 38a for a second exposure period. Because oncoming headlights have an intensity level that is substantially greater than that of leading taillights, the exposure period of the frame in which leading taillights is detected is at least approximately ten times the length of the exposure period during which oncoming headlights are detected. Most preferably, the exposure period for detecting leading taillights is approximately 40 times the exposure period for detecting oncoming headlights. In the illustrated embodiment, an exposure period of 0.004 seconds is utilized for detecting taillamps and 0.0001 seconds for detecting oncoming headlamps. The exposure period is the time during which each photosensor element 42 integrates photons before being read and reset by digital signal processor 13a. Estab-

6

lishing a different exposure period for detecting headlights verses taillights facilitates the use of existing and anticipated sensor technology by accommodating the dynamic range of such sensor technology. Exposure may also be adaptively established on a priority basis. In one such embodiment, exposure is set to a shorter headlight setting. If headlights are detected, the headlights 18 of vehicle 10 are dimmed and the exposure period is kept short. If no headlights are detected, the next frame is set to a longer exposure period. This has the advantage of shorter system cycle time as well as a reduction in sensitivity to sensor saturation and blooming. In another such embodiment, the exposure period is initially set to a long period. If an oncoming headlight is tentatively detected, the exposure period could then be switched to a short period to confirm the observation.

Vehicle headlight dimming control 12 carries out a control routine 100 (FIGS. 7a-7d). At the beginning of each pass through the routine, which occurs for every frame captured by the imaging sensor, a frame is grabbed at 102 and all of the pixels in the frame are processed as follows. Counters used for detecting white headlight sources and red taillight sources are zeroed at 104. It is then determined at 106 whether the previously processed frame was for detecting headlights or taillights. This is determined by looking at a variable "process.tails" which will be set to "yes" if the previous frame was processed to detect headlights and will be set to "no" if the previous frame was processed to detect taillights. If it is determined at 106 that the variable "process.tails" is set to "yes," the control proceeds to 108 in order to process the next frame to detect taillights. If it is determined at 106 that the variable process.tails is set to "no," then control passes to 109 in order to process the next frame as a headlight detecting frame.

The taillight detecting frame process begins at 108 by setting the exposure period for the imaging sensor module to grab the next frame according to a headlamp exposure level. In the illustrated embodiment, the exposure period for detecting headlights is set at 0.0001 seconds. Processing of the taillight frame proceeds at 110 by examining, for each "red" pixel, whether the intensity of light sensed by that pixel is greater than a threshold and whether the intensity of light sensed by that pixel is greater than a selected number of multiples of the intensity of light sensed by an adjacent "blue" pixel and a selected number of multiples of the intensity of light sensed by an adjacent "green" pixel. If so, then a "red" counter is incremented at 114. Preferably, the ratio of red pixel intensity to green or blue pixel intensity is selected as a power of 2 (2, 4, 8, 16 . . . ) in order to ease digital processing. However, other ratios may be used and different ratios can be used between red/green and red/blue pixels. In the illustrated embodiment, a ratio of 4 is selected based upon ratios established from CIE illuminant charts known to skilled artisans. Based upon these charts, a ratio greater than 4 would provide greater discrimination. Such greater discrimination may not be desirable because it could result in failure to identify a leading taillight and, thereby, a failure to dim the headlights of the controlled vehicle. After all pixels have been processed, the parameter "process.tails" is set to "no" at 116 and control proceeds to 118 (FIG. 7c).

In a similar fashion, processing of a headlight frame begins at 110 by setting the exposure period for the imaging sensor module to grab the next frame as a red taillight detecting frame. This is accomplished by setting the exposure period of the imaging sensor module to 0.004 seconds. It is then determined at 120 for each pixel whether an adjacent set of "red," "green," and "blue" pixels each exceeds a particular threshold and whether the pixel intensity levels all fall within a particular range, such as within 20 percent of each other. If all of the red, green, and blue pixels exceed a threshold and pass the ratio test, then it is determined that a white light source is being sensed and a "white" counter is incremented at 122.

1002-018

US 7,655,894 B2

7                                                    8

After all of the pixels in the frame have been processed, the process tails flag is set to a "yes" state at **124**. Control then passes to **118**.

It is determined at **118** whether both the "white" and the "red" counters are below respective high-beam thresholds. If so, a high-beam frame counter is incremented and a low-beam frame counter is set to zero at **120**. If it is determined at **118** that both the "white" and the "red" counters are not less than a threshold, it is then determined at **126** whether either the "red" counter or the "white" counter is greater than a respective low-beam threshold. If so, the high-beam frame counter is set to zero and the low-beam frame counter is incremented at **128**. If it is determined at **126** that neither the "red" counter or the "white" counter is greater than the respective low-beam threshold, then both the high-beam frame counters and the low-beam frame counters are set to zero at **130**.

Control then passes to **132** where it is determined if the low-beam frame counter is above a particular threshold. If so, high-beam enable signal **94** is set to a "low-beam" state at **134**. Additionally, the low-beam frame counter is set to the threshold level. If it is determined at **132** that the low-beam frame counter is not greater than its threshold, it is determined at **136** whether the high-beam frame counter is greater than its threshold. If so, high-beam enable signal **94** is set to "high-beam" state at **138** and the high-beam frame counter is reset to its threshold level.

Control routine **100** provides hysteresis by requiring that a headlight spectral signature or a taillight spectral signature be detected for a number of frames prior to switching the head-lights to a low-beam state. Likewise, the absence of a detection of an oncoming headlight or a leading taillight must be made for multiple frames in order to switch from a low-beam to a high-beam state. This hysteresis guards against erroneous detection due to noise in a given frame and eliminates head-lamp toggling when sources are at the fringe of detection range. In the illustrated embodiment, it is expected that a vehicle headlight control system **12** will respond to a change in the state of light sources in the forward field of view of the vehicle in less than 0.5 seconds. An additional level of hysteresis may be provided by forcing the headlamps to stay in a low-beam state for a given number of seconds after a transition from high beams to low beams. The reverse would not occur; namely, holding a high-beam state for a particular period to avoid annoyance to drivers of oncoming or leading vehicles.

In the illustrated embodiment, red light sources, which have the spectral signature and intensity of taillights, are detected by determining that a "red" pixel, namely a pixel which is exposed to light in the visible red band, is both greater than a given multiple of the "green" and "blue" adjacent pixels, as well as being greater than a threshold and that white light sources, which are the spectral signatures of head-lights, are detected by determining that "red," "green," and "blue" pixels are both within a particular intensity range of each other as well as being greater than a threshold. This double-testing helps to reduce false detection of light sources. However, it would be possible to detect red light sources only by looking at the intensity of "red" pixels and to detect white light sources by determining that an adjacent set of "red," "blue," and "green" pixels are all above a particular threshold.

In the illustrated embodiment, spectral filtering is carried out in a manner which exposes each photosensing element in the photosensor array to a band of light falling within one of the primary ranges of the visible spectrum, namely red, green, or blue as illustrated in FIG. **8***a*. However, different bands in the frequency spectrum may be utilized including not only visible spectrum bands but invisible spectrum bands including infrared and ultraviolet bands as illustrated in FIG. **8***b*.

The band selection could also be chosen from visible spectral regions that do not correspond with the primary spectrums. For example, the spectral filter may be selected in order to detect at the pixel level red light sources and the complement of red light sources as illustrated in FIG. **8***c*. These binary indications could be utilized to detect red taillights by determining that the "red" pixel is greater than a threshold and greater than a number of multiples of the intensity sensed by the "red complement" pixel adjacent thereto. Likewise, a white light source indicative of oncoming headlights could be detected by determining that both the "red" pixel and the "red complement" pixel adjacent thereto are both above a particular threshold and within a particular intensity range of each other. It may also be desirable to select bands that fall between primary spectrum regions or any other bands that may be desirable for a particular application.

Photosensing array **38** may be a charge couple device (CCD) array of the type commonly utilized in video camcorders and the like. Alternatively, photosensing array **38** could be a CMOS array of the type manufactured by VLSI Vision Ltd. (VVL) in Edinburgh, Scotland. Additionally, a hybrid of the CCD and CMOS technology may be employed. Other potentially useful photosensing technologies include CID, MOS, photo diodes, and the like.

In an alternative embodiment, an imaging sensor module **14***b* includes two or more pairs of photosensor arrays **38***b* (FIG. **6**). Each photosensor array **38***b* has an associated spectral filter array **40***b* and optical device **36***b*. In this embodiment, each array **38***b* is operated by digital signal processor **58***b* to have an exposure period that is set for detecting either oncoming headlights or leading taillights. In this manner, each frame of the scene captured by each array is utilized to detect a particular light source. This is in contrast to light-sensing module **14***a* in FIG. **5** in which each light source is detected in alternating frames. Each spectral filter **40***b* is identical, whereby each array **38***b* is capable of detecting light sources having spectrum composition including red, green, and blue regions of the spectrum. However, the spectral filters may be custom configured to the particular application. This may result in a homogeneous composition or a more complex mosaic, especially where light sources are examined in three or more spectral regions.

In yet an additional single lens system embodiment, an imaging sensor module **14***c* includes three light-sensing arrays (not shown) and a spectral separation device overlying the light-sensing arrays which directs spectral bands to different arrays (FIG. **9**). An example of such spectral separation device is a refracting optical splitter, such as dichroic mirrors or prisms. In this manner, each light-sensing array detects light in either the red or green or blue region of the spectrum. As such, imaging sensor module **14***c* produces three output signals on a line **64**, each representing detected light in one of the red or green or blue spectral regions. The output signals on line **64** include frame-timing signals which are decoded by digital acquisition circuits **66** which produces a digital output signal **68'** indicative of intensity levels of adjacent red, green, and blue pixels. Digital acquisition circuit **66** additionally produces a timing signal output **70** which is utilized by a detection control circuit **72** in order to supply synchronizing signals, at **74**, to imaging sensor module **14***c* and digital acquisition circuit **66**. A control and timing signal **86** is produced by digital acquisition circuit **66** and supplied to detection circuits **76** and **78** and ambient detection circuit **84** in order to enable the circuits to distinguish between subsequent frames captured by the light-sensing modules. As with previously described embodiments, digital output signal **68'** is supplied to taillight detection circuit **76**, headlight detection circuit **78**, and ambient sense logic circuit **84**.

The present invention is capable of identifying point sources of light in any particular location within the scene

US 7,655,894 B2

9

viewed forward of the vehicle. Additional discrimination between oncoming headlights and leading taillights may be accomplished by taking into account the relative location of the source of light within the scene. For example, as best seen by reference to FIG. 11a, particular relationships have been discovered to exist between light sources of interest and their spatial location forward of the vehicle. Oncoming headlights and leading taillights of interest can be characterized, at least in part, based upon their displacement from the central axis of the vehicle. On-axis light sources of interest can be both close and far away separation distances. However, off-axis light sources may only be of interest if at a close separation distance from the vehicle. Assuming for illustration purposes that headlights and taillights are of the same size, headlights and taillights of interest occupy an increasing spatial area as they move off axis. Therefore, the resolution required to detect lights of interest may decrease off axis. Additionally, the fact that close-up off-axis light sources have significant spatial area would allow image-processing techniques to be employed to discriminate between close-up off-axis light sources of interest and distant off-axis light sources, which are not of interest. This may be accomplished through customized optics or other known variations in pixel resolution. Furthermore, headlights and taillights of interest are of greater intensity, because of their closeness, off axis. This allows an increase in intensity detection thresholds off axis without missing detection of such light sources. This increase in detection threshold and reduction in resolution off axis assists in avoiding false detection of light sources not of interest, such as streetlights, building lights, and the like.

In order to take into account this spatial differentiation, the present invention comprehends detecting light sources at a lower threshold centrally of the scene and at a higher threshold at the periphery of the scene. This may be accomplished either optically, or electronically, or both. Optically, this may be accomplished by providing a non-uniform magnification to optical device 36. For example, an optical device may have optical magnification at a central portion thereof and an optical attenuation at a peripheral region thereof. Additionally, optical device 36 may have a relatively wide horizontal field of view and a relatively narrow vertical field of view. The narrow vertical field of view would tend to reduce the detection of street lights and other overhead light sources. In a preferred embodiment, optical device 36 is a lens that is made from injection-molded plastic. Electronically, such spatial differentiation may be accomplished by establishing a higher threshold level for pixel intensity detection for pixels located at the periphery of the scene than for pixels located centrally of the scene. This would cause centrally positioned light sources to be detected at a lower intensity level than sources detected at the periphery of the scene. Such spatial differentiation could also be accomplished by a non-symmetrical mapping of light to the sensor array, as illustrated in FIG. 11b, or by masking portions 98a, 98b, and 98c, at the periphery of the scene, as illustrated in FIG. 11c, so that those portions are not sensed at all. Spatial differentiation could also be accomplished by providing non-uniform pixel size.

The present invention is exceptionally sensitive to sources of light having spectral signatures of oncoming headlights and leading taillights. By recognizing the spectral signature of the light sources, many non-relevant light sources may be ignored. By examining light sources pixel-by-pixel, relatively small light sources may be detected at great distances in order to dim the headlights well before they become a nuisance to the driver of the vehicle ahead of the control vehicle. This is accomplished, according to a preferred embodiment, by utilizing an imaging sensor made up of an array of photosensing elements in a compact design which responds to light sources in a scene forward of the vehicle. Furthermore, such sensor preferably utilizes digital processing techniques which

10

are well adapted for use with custom digital electronic circuitry, avoiding the expense and speed constraints of general purpose programmable microprocessors.

The present invention takes advantage of the spectral signatures both of light sources which must be detected in a headlight dimming control as well as the spectral signatures of light sources which must be rejected in a headlight dimming control. For example, federal regulations establish specific spectral bands that must be utilized in vehicle taillights; namely red. Furthermore, federal legislation prohibits the use of red light sources in the vicinity of a highway. Lane markers, signs, and other sources of reflected light are all specified in a manner which may be readily identified by spectral signature. Oncoming headlights, according to known technology, have a visible spectral signature which is predominantly white light. As light source technology evolves, the present invention facilitates detection of other spectral signatures of light sources in the future.

The present invention is capable of utilizing spatial filtering to even further enhance the ability to identify light sources. By spatial filtering is meant consideration of not only whether a particular pixel, or pixel group, is detecting a light source having a particular spectral signature, but also what adjacent, or closely related, pixels or pixel groups, are detecting. For example, it can be concluded that very closely adjacent red and white light sources are not of interest as oncoming headlights or taillights. An example where such pattern could be observed is a streetlight observed with a system having imperfect color correction, which can produce a White light surrounded by a red halo. By evaluation of adjacent pixel groups, a closely proximate red light source and white light source can be identified as a streetlight and not either a headlight or a taillight.

Pattern recognition may be used to further assist in the detection of headlights, taillights, and other objects of interest. Pattern recognition identifies objects of interest based upon their shape, reflectivity, luminance, and spectral characteristics. For example, the fact that headlights and taillights usually occur in pairs could be used to assist in qualifying or disqualifying objects as headlights and taillights. By looking for a triad pattern, including the center high-mounted stoplight required on the rear of vehicles, stoplight recognition can be enhanced. Furthermore, object recognition can be enhanced by comparing identified objects over successive frames. This temporal processing can yield information on object motion and can be used to assist in qualifying or disqualifying objects of interest.

Spatial filtering can also be useful in identifying atmospheric conditions by detecting effects on light sources caused by particular types of atmospheric conditions. One such atmospheric condition is fog. A bright light source 102 is surrounded by a transition region 104 between the intensity of the light source and the black background (FIG. 12a). Fog, or fine rain, tends to produce a dispersion effect around light sources which causes a series of transition regions 104a, 104b . . . 104n which extend further from the light source (FIG. 12b). By placing appropriate limits on the size of the transition region, fog or light rain, or a mixture of both, or other related atmospheric conditions, can be detected. In response to such atmospheric conditions, vehicle headlight dimming control 12 may activate fog lights, inhibit switching to high beams, or perform other control functions. Furthermore, fog, or fine rain, can be detected, or confirmed, by analyzing the effects of headlights 18 in the forward scene as reflected off of moisture particles.

Spatial filtering can also be used to detect rain on windshield 32. This may be accomplished by performing statistical analyses between a pixel, or pixel group, and adjacent pixels or pixel groups. A view forward of a vehicle through a dry windshield would be sensed by an imaging sensor module

1002-020

US 7,655,894 B2

11

as continuously varying differences between adjacent pixels, or pixel groups, assumed to be under constant illumination from light sources. When, however, a droplet of water or a snowflake is on windshield 32, an effect is created which causes a lack of continuous variation of differences between adjacent pixels, or pixel groups. This has the tendency to reduce the first derivative of the pixel, a condition which can be determined by processing.

Processing can be used to determine the first derivative of an image captured by image-sensing module 14 by determining a measure of the entropy, or disarray, of a pixel, or pixel group, with respect to its neighbors. For example, an approximation of the first derivative for a pixel is:

$$\frac{d(P_i)}{dxy} = \frac{\sqrt{\sum\limits_{j=1}^{n}(Pi - Pj)^2}}{N}$$

where N=8 and where Pi is a given pixel and Pj is one of 8 neighboring pixels.

It will be apparent to those skilled in the art that the invention is capable of performing control functions other than controlling the dimming of the vehicle's headlights. For example, spectral signature identifications may be utilized to detect the state of a traffic light to either warn the driver that a light has changed from green to yellow to red or to automatically decelerate and stop the vehicle. Also, by sensing that the intensity of a leading taillight has abruptly increased, a condition where the leading vehicle is braking may be identified and suitable action taken.

The invention may be utilized to identify particular traffic signs by their spectral signature as well as their geometric organization. For example, red octagons may be identified as stop signs, yellow triangles as caution signs, and the like. These capabilities are a result of the present invention providing a significant reduction in the amount of data to be processed because the image forward of the vehicle is captured in a manner which preselects data. Preselection of data is accomplished by configuring the sensor array, including the optics thereof, to consider the spatial, as well as the spectral, characteristics of light sources.

The present invention may be used to determine the environment in which the vehicle is operated. For example, a high level of "non-qualified" light sources; namely, light sources that are not headlights or taillights, as well as "qualified" light sources can be used to determine a measurement of the activity level around the vehicle; namely, that the vehicle is in an urban environment which may be a useful input for particular control algorithms. This may be accomplished as follows. An activity counter is established which represents a total number of pixels, or pixel groups, whose red, green, or blue components exceed a threshold. The threshold is set to a relatively low value, namely just above the noise floor. This counter, which registers any real detected source, is reset and retabulated every frame, preferably during the exposure period for detecting taillights. If the activity counter exceeds a particular value, then a high activity environment is detected. One use of this information would be to inhibit the control from switching the vehicle's headlights from a low-beam state to a high-beam state unless a low activity condition exists for awhile. The activity counter may be used by the control in combination with a low-beam duration counter which records the number of frames that the system has been in a low-beam state. It is reset upon system power-up and at every transition from the high-to-low beam states. The control may be inhibited from switching the vehicle's headlights to the high-beam state unless either the low-beam duration

12

counter exceeds a value or the activity counter indicates a sustained low activity condition.

The present invention can be used to detect lane markers in order to either assist in steering the vehicle or provide a warning to the driver that a lane change is occurring. The capability of the invention to detect rain on the vehicle's windshield could be used to control the vehicle's wipers both between OFF and ON conditions and to establish a frequency of intermittent operation.

Changes and modifications in the specifically described embodiments can be carried out without departing from the principles of the invention which is intended to be limited only by the scope of the appended claims, as interpreted according to the principles of patent law including the doctrine of equivalents.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. An image sensing system for a vehicle, said image sensing system comprising:

an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate;

wherein said imaging sensor is disposed at an interior portion of the vehicle proximate the windshield of the vehicle and wherein said interior portion is at or proximate to an interior rearview mirror assembly of the vehicle and wherein said imaging sensor has a forward field of view to the exterior of the vehicle through the windshield;

a logic and control circuit comprising an image processor for processing image data derived from said imaging sensor;

wherein said image sensing system identifies objects of interest by processing said image data to identify objects of interest based at least on spectral differentiation; and

wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor.

2. The image sensing system of claim 1, wherein said image sensing system processes said image data to identify objects of interest based on at least one of (i) spatial differentiation, (ii) spectral signature recognition, and (iii) pattern recognition.

3. The image sensing system of claim 1, wherein said image processing comprises pattern recognition and wherein said image sensing system identifies objects of interest based on at least one of (i) shape, (ii) reflectivity, (iii) luminance, and (iv) spectral characteristic.

4. The image sensing system of claim 1, wherein objects of interest are at least one of qualified and disqualified based at least in part on object motion in said field of view of said imaging sensor.

5. The image sensing system of claim 1, wherein at least one of (a) said array of light sensing photosensor elements and at least a portion of said logic and control circuit are formed on said semiconductor substrate and wherein said portion of said logic and control circuit comprises at least one of (i) an analog-to-digital converter, (ii) a logic circuit, (iii) a clock, (iv) random access memory, and (v) a digital-to-analog converter, and (b) at least one of (i) said array of light sensing photosensor elements and (ii) at least a portion of said logic and control circuit is formed on said semiconductor substrate as a CMOS device.

6. The image sensing system of claim 1, wherein at least one of (a) at least a portion of said logic and control circuit is commonly formed with said array of light sensing photosen-

1002-021

US 7,655,894 B2

13

sor elements on said semiconductor substrate as an integrated circuit, (b) said logic and control circuit comprises a logic circuit and at least a portion of said logic circuit comprises a configuration of digital logic elements formed on said semiconductor substrate, and (c) said logic and control circuit comprises a logic circuit comprising at least one of (i) a central processing unit and (ii) a read-only-memory.

7. The image sensing system of claim 1, wherein anti-blooming is provided to mitigate the effect of charge leakage from one of said light sensing photosensor elements to an adjacent one of said light sensing photosensor elements.

8. The image sensing system of claim 1 further comprising a lens imaging light external of the vehicle onto said array of light sensing photosensor elements, and wherein at least one of (a) said lens comprises a molded plastic lens and (b) said lens is at least one of (i) bonded to said imaging sensor and (ii) in close contact with said imaging sensor.

9. The image sensing system of claim 1, wherein said image sensing system determines a background light level.

10. The image sensing system of claim 1, wherein said logic and control circuit comprises at least one control output and wherein said at least one control output at least one of (a) controls as a function of a speed of the vehicle, (b) controls a headlamp of the vehicle in response to said image processing, and (c) controls a speed of the vehicle in response to said image processing.

11. The image sensing system of claim 1, wherein said image sensing system identifies headlamps of approaching vehicles and taillights of leading vehicles.

12. The image sensing system of claim 1, wherein said image sensing system determines an environment in which the vehicle is being driven, and wherein said image sensing system adjusts control of a headlamp of the vehicle in response to said determination of the environment in which the vehicle is driven.

13. The image sensing system of claim 1, wherein said image sensing system detects lane markers on a road being traveled by the vehicle and present in the field of view of said imaging sensor.

14. The image sensing system of claim 13, wherein said detection of lane markers comprises identification by spectral signature.

15. The image sensing system of claim 1 further comprising a spectral filter for passing visible light that is within a spectral region that generally corresponds with the visible light spectral signature of a taillight of a vehicle, said spectral filter substantially attenuating light having a wavelength greater than about 830 nanometers, said spectral filter disposed in front of some but not all of said photosensor elements.

16. The image sensing system of claim 1, wherein said imaging sensor has a forward field of view to the exterior of the vehicle through an area of the windshield that is swept by a windshield wiper of the vehicle.

17. An image sensing system for a vehicle, said image sensing system comprising:

an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate;

wherein said imaging sensor is disposed at an interior portion of the vehicle and wherein said imaging sensor has a forward field of view to the exterior of the vehicle through an area of the windshield that is swept by a windshield wiper of the vehicle;

a logic and control circuit comprising an image processor for processing image data derived from said imaging sensor;

14

said processing of image data comprising, at least in part, a comparison by said logic and control circuit of a frame comprising image data to a successor frame in order to identify, at least in part, an object of interest; and

wherein an object of interest is at least one of qualified and disqualified based at least in part on object motion in said field of view of said imaging sensor.

18. The image sensing system of claim 17, wherein at least one of (a) said logic and control circuit comprises at least one control output and wherein said at least one control output controls as a function of a speed of the vehicle, (b) said logic and control circuit comprises at least one control output and wherein said at least one control output controls a headlamp of the vehicle in response to said image processing, (c) said logic and control circuit comprises at least one control output and wherein said at least one control output controls a speed of the vehicle in response to said image processing, and (d) said image sensing system detects lane markers on a road being traveled by the vehicle and present in the field of view of said imaging sensor.

19. The image sensing system of claim 17, wherein said image sensing system processes said image data to identify objects of interest based on at least one of (i) spatial differentiation, (ii) spectral differentiation, and (iii) pattern recognition.

20. The image sensing system of claim 17, wherein said image processing comprises pattern recognition and wherein said image sensing system identifies objects of interest based on at least one of (i) shape, (ii) reflectivity, (iii) luminance, and (iv) spectral characteristic.

21. An image sensing system for a vehicle, said image sensing system comprising:

an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate;

wherein said imaging sensor is disposed at an interior portion of the vehicle and wherein said imaging sensor has a forward field of view to the exterior of the vehicle through the windshield;

a logic and control circuit comprising an image processor for processing image data derived from said imaging sensor;

wherein said image sensing system identifies objects of interest by processing said image data to identify objects of interest based on at least one of (i) spatial differentiation, (ii) spectral differentiation, and (iii) pattern recognition;

wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor; and

wherein objects of interest are at least one of qualified and disqualified based on object motion in said field of view of said imaging sensor.

22. The image sensing system of claim 21, wherein at least one of (a) said logic and control circuit comprises at least one control output and wherein said at least one control output controls as a function of a speed of the vehicle, (b) said logic and control circuit comprises at least one control output and wherein said at least one control output controls a headlamp of the vehicle in response to said image processing, (c) said logic and control circuit comprises at least one control output and wherein said at least one control output controls a speed of the vehicle in response to said image processing, and (d) said image sensing system detects lane markers on a road being traveled by the vehicle and present in the field of view of said imaging sensor.

US 7,655,894 B2

15

**23**. The image sensing system of claim **21** further comprising a lens imaging light external of the vehicle onto said array of light sensing photosensor elements, and wherein said lens comprises a molded plastic lens bonded to said imaging sensor.

**24**. The image sensing system of claim **21**, wherein said image processing comprises pattern recognition and wherein said image sensing system identifies objects of interest based on at least one of (i) shape, (ii) reflectivity, (iii) luminance, and (iv) spectral characteristic.

**25**. An image sensing system for a vehicle, said image sensing system comprising:

an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate;

wherein said imaging sensor is disposed at an interior portion of the vehicle and wherein said imaging sensor has a forward field of view to the exterior of the vehicle through an area of the windshield that is swept by a windshield wiper of the vehicle;

a logic and control circuit comprising an image processor for processing image data derived from said imaging sensor;

wherein said image sensing system identifies objects of interest by processing said image data to identify objects of interest based at least on spectral differentiation;

a spectral filter disposed in front of some but not all of said photosensor elements, wherein said spectral filter comprises a red filter that passes visible light of wavelength generally in the visible red spectral band and that substantially attenuates light having wavelengths outside the visible red spectral band; and

wherein a comparison is made by said logic and control circuit of a frame comprising image data to a successor frame in order to identify, at least in part, an object of interest.

**26**. The image sensing system of claim **25**, wherein visible light incident at said imaging sensor and not passing through said spectral filter impinges on at least some of said photosensor elements.

16

**27**. The image sensing system of claim **26**, wherein objects of interest are at least one of qualified and disqualified based at least in part on object motion in said field of view of said imaging sensor.

**28**. The image sensing system of claim **25**, wherein said spectral filter passes visible light that generally corresponds with the visible light spectral signature of a taillight of a vehicle, said spectral filter substantially attenuating light having a wavelength greater than about 830 nanometers.

**29**. An image sensing system for a vehicle, said image sensing system comprising:

an imaging sensor comprising a two-dimensional array of light sensing photosensor elements formed on a semiconductor substrate;

wherein said imaging sensor is disposed at an interior portion of the vehicle and wherein said imaging sensor has a forward field of view to the exterior of the vehicle through an area of the windshield that is swept by a windshield wiper;

a logic and control circuit comprising an image processor for processing image data derived from said imaging sensor;

wherein said image sensing system processes said image data to identify objects of interest based on at least one of (i) spatial differentiation, (ii) spectral differentiation, and (iii) pattern recognition;

wherein said image sensing system further comprises a lens imaging light external of the vehicle onto said array of light sensing photosensor elements, and wherein said lens is bonded to said imaging sensor; and

wherein objects of interest are at least one of qualified and disqualified based at least in part on object motion in said field of view of said imaging sensor.

**30**. The image sensing system of claim **29**, wherein identification of objects of interest is enhanced by comparing over successive frames image data associated with objects in said forward field of view of said image sensor.

**31**. The image sensing system of claim **30**, wherein said lens comprises a molded plastic lens bonded to said imaging sensor.

\* \* \* \* \*

1002-023

**A0497**

# PROOF OF SERVICE

I hereby certify that on December 21, 2015, a copy of the foregoing **BRIEF FOR APPELLANT TRW AUTOMOTIVE U.S., LLC** was electronically filed with the United States Court of Appeals for the Federal Circuit using CM/ECF and said system generated and sent a Notice of Docket Activity via email to the following counsel record:

> David K. S. Cornwell
> Jason D. Eisenberg
> Richard D. Coller, III
> Sterne, Kessler, Goldstein & Fox, P.L.L.C.
> 110 New York Avenue, NW
> Washington D.C.  20005
> davidc@skgf.com
> jasone@skgf.com
> rcoller@skgf.com
>
> *Counsel for Defendants-Appellees*

/s/ Jon R. Trembath
Jon R. Trembath

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FEDERAL CIRCUIT RULE 32(a)

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.     This brief complies with the type volume limitation of 32(a)(7)(B), Fed. R. App. P. because:

- this brief contains 5,217 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

- this brief has been prepared in a proportionally spaced typeface, using Microsoft Word 14 Times New Roman font.

Dated:  December 21, 2015

Respectfully submitted,

/s/ *Jon R. Trembath*

Jon R. Trembath
James E. Dallner
Alexander C. Clayden
LATHROP & GAGE LLP
950 17th Street, Suite 2400
Denver, Colorado 80202
Telephone:   (720) 931-3200
Fax:   (720) 931-3201
Email:  jtrembath@lathropgage.com
        jdallner@lathropgage.com
        aclayden@lathropgage.com

Douglas Link
LATHROP & GAGE LLP
4845 Pearl East Circle, Suite 201
Boulder, Colorado  80301
Telephone:   (720) 931-3000
Fax:   (720) 931-3001
Email:        dlink@lathropgage.com